McLANE MINNESOTA, INC., Relator,

v.

COMMISSIONER OF REVENUE,
Respondent.

No. A08–1632.

Supreme Court of Minnesota.

Sept. 17, 2009.

Rehearing Denied Oct. 22, 2009.

Thomas R. Muck, Masha M. Yevzelman, Fredrikson & Byron, P.A., Minneapolis, MN, for relator.

Lori Swanson, Attorney General, Rita Coyle DeMeules, Assistant Attorney General, St. Paul, MN, for respondent.

## OPINION

DIETZEN, Justice.

Following an audit, the Commissioner of Revenue (Commissioner) issued an order assessing additional tobacco tax against McLane Minnesota, Inc. (McLane). McLane appealed that order and also sought a refund for the tobacco tax paid, arguing that it erroneously calculated its tax on the price that it paid its suppliers for tobacco products rather than the manufacturer's list price. The Commissioner denied McLane's administrative appeal and refund claim, and McLane appealed to the Minnesota Tax Court. On cross-motions for summary judgment, the tax court granted the Commissioner's motion for partial summary judgment and denied McLane's motion. McLane petitioned for a writ of certiorari on the question of whether it is entitled to a refund.[1] We affirm.

McLane is located in Northfield, Minnesota, and distributes food, candy, cigarettes, and tobacco products to grocery stores, convenience stores, and mass merchandisers in Minnesota. McLane Company acquired its Minnesota facility in May 2002 and became a licensed "tobacco products distributor" under Minn.Stat. § 297F.03 (2008).

Minnesota imposes a tax on "all tobacco products in [Minnesota] and upon any person engaged in business as a distributor." Minn.Stat. § 297F.05, subd. 3 (2008). The tax rate is "35 percent of the wholesale sales price of the tobacco products." *Id.*

McLane buys smokeless tobacco products for resale in Minnesota from several suppliers. In some cases, McLane buys tobacco products directly from the manufacturer. Then it calculates the Minnesota tobacco tax on the price charged by the manufacturer. McLane purchases 90–95 percent of its smokeless tobacco products from two companies: UST Sales and Conwood Sales.

Before 1990, U.S. Smokeless Tobacco Company (USSTC) performed all functions related to the manufacturing, sales, and marketing of its smokeless tobacco products, which it sold directly to unaffiliated customers. In 1990, USSTC reorganized, creating UST Manufacturing and UST Sales as wholly-owned subsidiaries to perform, respectively, the manufacturing and the sales and marketing functions previously performed by USSTC. After the

1. McLane's appeal of the Commissioner's additional tax assessment was subsequently resolved and is not part of this appeal.

1990 restructuring, USSTC became a holding company for UST Manufacturing and UST Sales. Thereafter, UST Manufacturing and UST Sales have had an exclusive relationship. UST Manufacturing sells all of the tobacco products that it manufactures to UST Sales. UST Sales purchases tobacco products exclusively from UST Manufacturing, sells tobacco products to distributors such as McLane, markets UST products, and provides samples.

Originally, Conwood manufactured and sold its smokeless tobacco products through a single entity. Conwood reorganized in the late 1990s. After the reorganization, Conwood Sales purchased tobacco products exclusively from a related entity of Conwood Manufacturing, Rosswil LLC. Conwood Manufacturing manufactures the tobacco products, and Conwood Sales buys, markets, and sells the tobacco products. For ease of reference, the UST and Conwood manufacturing entities will be referred to generally as "Manufacturing" and the UST and Conwood sales entities will be referred to as "Sales."

For the relevant tax years, McLane ordered smokeless tobacco products by placing a purchase order with Sales, not Manufacturing. Subsequently, Sales purchased the tobacco products from Manufacturing at a price that reflected Manufacturing's costs and anticipated profits. Thereafter, Sales resold tobacco products to McLane at an increased price to cover its sales, marketing, promotions, product sampling, and distribution activities. The shipping of the tobacco products to McLane's warehouse in Minnesota was arranged by Manufacturing as an agent for Sales. Also, when the common carrier picked up the tobacco products from Manufacturing's shipping dock outside of Minnesota, title transferred to Sales, and then title was transferred to McLane upon delivery to McLane's warehouse.

Following an audit of McLane's 2004 tobacco purchases and sales, the Commissioner issued an order assessing additional tobacco tax against McLane. McLane appealed that order administratively and also sought a refund for tobacco tax paid from January 1, 2002, through June 30, 2005, arguing that it erroneously calculated its tax on the price that it paid its suppliers for tobacco products rather than the manufacturer's list price. The Commissioner denied McLane's administrative appeal and refund claim, and McLane appealed both issues to the Minnesota Tax Court. Both parties filed cross-motions for partial summary judgment. Following a hearing, the tax court issued its order on February 5, 2008, granting the Commissioner's motion for partial summary judgment and denying McLane's motion. Final judgment was entered and McLane petitioned this court for a writ of certiorari, arguing that the tax court committed errors of law when it denied McLane's refund claim and that its decision was not justified by the evidence.

I.

██ McLane contends that it overpaid its tobacco tax under Minn.Stat. § 297F.05, subd. 3, and is entitled to a refund from January 1, 2002, through June 30, 2005. According to McLane, it erroneously calculated the tax on the price that it paid Sales for tobacco products, rather than on Manufacturing's list price. The Commissioner argues that the tobacco tax is calculated based on the price McLane paid Sales. The crux of the case involves the interpretation of Minnesota's tobacco tax statutes set forth in Minn.Stat. ch. 297F.

██ We review decisions from the Minnesota Tax Court to determine whether: (1) the tax court had jurisdiction, (2) the tax court decision was supported by

the evidence and was in conformity with the law, and (3) the tax court committed any other error of law. *Mayo Collaborative Servs., Inc. v. Comm'r of Revenue*, 698 N.W.2d 408, 412 (Minn.2005); *see also* Minn.Stat. § 271.10, subd. 1 (2008). When, as here, the parties stipulate to the underlying facts, we need only consider whether the law was properly applied. *Mayo Collaborative Servs.*, 698 N.W.2d at 412. We review the tax court's conclusions of law and interpretation of statutes de novo. *Id.*

■ The goal of any statutory construction is "to ascertain and effectuate the intention of the legislature." Minn.Stat. § 645.16 (2008). Every statute "shall be construed, if possible, to give effect to all its provisions." *Id.* When the language of a taxing statute is clear and unambiguous, the court may not engage in further construction of its intended meaning. *Id.; Willmus v. Comm'r of Revenue*, 371 N.W.2d 210, 212 (Minn.1985).

The parties dispute the construction and application of two statutes: Minn.Stat. §§ 297F.05, subd. 3, which establishes the basis for the tobacco tax, and 297F.01, subd. 23, which defines "wholesale price" for purposes of the tobacco tax. Section 297F.05, subd. 3, provides:

A tax is imposed upon all tobacco products in this state and upon any person engaged in business as a distributor, at the rate of 35 percent of the *wholesale sales price* of the tobacco products. The tax is imposed at the time the distributor:

(1) brings, or causes to be brought, into this state from outside the state tobacco products for sale;

(2) makes, manufactures, or fabricates tobacco products in this state for sale in this state; or

(3) ships or transports tobacco products to retailers in this state, to be sold by those retailers.

(Emphasis added.) Two different versions of section 297F.01, subdivision 23 are applicable to the tax years at issue. For tax years 2002 through June 30, 2003, subdivision 23 provided as follows: " 'Wholesale price' means the established price for which a manufacturer or person sells a tobacco product to a distributor, exclusive of any discount or other reduction." Minn. Stat. § 297F.01, subd. 23 (2002). The statute was amended in 2003 to read as follows:

"Wholesale sales price" means the price stated on the price list in effect at the time of sale for which a manufacturer or person sells a tobacco product to a distributor, exclusive of any discount, promotional offer, or other reduction. For purposes of this subdivision, "price list" means the manufacturer's price at which tobacco products are made available for sale to all distributors on an ongoing basis.

Minn.Stat. § 297F.01, subd. 23 (2004). This amended version applies to the tax periods of July 2003 through 2005.

Under section 297F.05, subdivision 3, the tobacco tax is based on the "wholesale sales price" of the tobacco products. McLane contends the wholesale sales price is the price that Manufacturing charged Sales for its products. The Commissioner argues that the wholesale sales price is the price that Sales charged to McLane for tobacco products.

*A. Tax years 2002–2003*

For the disputed tax periods of May 2002 through June 30, 2003, the statute defined "wholesale price" as "the established price for which a manufacturer or person sells a tobacco product to a distributor, exclusive of any discount or other

reduction." Minn.Stat. § 297F.01, subd. 23 (2002). It is undisputed that McLane is the tax-liable distributor. The tobacco products were sold to the distributor[2] McLane, by a person,[3] Sales; therefore, based on the plain language of the statute, the "wholesale price" was the price for which Sales sold the products to McLane.

McLane contends that the price on which the tax should be based is always the manufacturer's price, regardless of who sold the products to the tax-liable distributor. According to McLane, the statute referring to the "established price for which a manufacturer *or person* sells a tobacco product" supports its position. *See* Minn.Stat. § 297F.01, subd. 23 (emphasis added). McLane argues "or person" merely explains that tobacco products may be sold by "persons" who are not "manufacturers." McLane suggests that the "established price" remains the manufacturer's list price that is in effect at the time that either a "manufacturer or person" sells to a distributor. We disagree. Under the statute, the manufacturer's price is not the price "for which" a non-manufacturer "person" sells tobacco products. Thus, the price "for which" Sales sold tobacco products to McLane was Sales's price, not Manufacturer's price.[4] Indeed, had the legislature intended to base the tobacco tax on the manufacturer's price regardless of who made the sale, it could simply have stated in section 297F.05, subdivision 3, that the tax is 35 percent of the "manufacturer's price," instead of the "wholesale sales price," and defined "manufacturer's price" solely in terms of the price for which the manufacturer sells the product.

McLane also argues that because Sales is a licensed distributor of tobacco products in Minnesota and causes tobacco products to be brought into the state, the price at which the manufacturer sells products to Sales, as a distributor, should be the wholesale price for purposes of calcu-

**2.** Minnesota Statutes § 297F.01, subd. 20 (2008), defines "tobacco products distributor" as any of the following:

> (1) a person engaged in the business of selling tobacco products in this state who brings, or causes to be brought, into this state from outside the state any tobacco products for sale;
> (2) a person who makes, manufactures, or fabricates tobacco products in this state for sale in this state;
> (3) a person engaged in the business of selling tobacco products outside this state who ships or transports tobacco products to retailers in this state, to be sold by those retailers.

McLane is a distributor under category (1).

**3.** Minnesota Statutes § 297F.01, subd. 12 (2008), defines "person" as "an individual or any entity engaged in the sale of cigarettes or tobacco products."

**4.** We note that the Colorado Court of Appeals construed a similar tobacco tax statute in a manner consistent with our decision in this case. In Colorado a tobacco tax is imposed "at the rate of twenty percent of the manufacturer's list price." *McLane Western, Inc. v. Dep't of Revenue*, 126 P.3d 211, 213 (Colo.Ct. App.2005) (quoting Colo.Rev.Stat. § 39–28.5–102 (2008)) (emphasis added), *cert. denied*, 2006 WL 349738 (Colo. Jan. 9, 2006), *cert. denied*, 549 U.S. 810, 127 S.Ct. 42, 166 L.Ed.2d 18 (2006). Colorado law defines "manufacturer's list price" as "the invoice price for which a manufacturer or supplier sells a tobacco product to a distributor." *Id.* at 214 (quoting Colo.Rev.Stat. § 39–28.5–101(3) (2008)). This language parallels our definition of wholesale price in section 297F.01, subdivision 23, only substituting "supplier" for "person." Interpreting this language in the face of a claim that the tax should be based on the price charged by the manufacturer to a sales subsidiary from which McLane bought tobacco products in Colorado, the Colorado Court of Appeals held that the plain language of the statute required the tax to be based instead on the price for which the supplier sold the products to McLane. *See McLane Western*, 126 P.3d at 217–18.

lating the tax. We reject this interpretation because it utilizes different meanings for the term "distributor" within related statutes. Specifically, section 297F.05, subdivision 3, imposes the tax on "any person engaged in business as a distributor." Indeed, McLane acknowledges that it is the tax-liable distributor for the purposes of the sales at issue. Further, subdivision 3 defines when the tax is imposed in terms of the actions of *"the* distributor," which necessarily refers to the previously mentioned tax-liable distributor, not just any distributor. Finally, wholesale price is defined in section 297F.01, subdivision 23, in terms of the price "for which a manufacturer or person sells a tobacco product to a *distributor."* (Emphasis added.) The most sensible construction of this language is that the legislature was again referring to the tax-liable distributor.[5]

The primary basis for McLane's argument that wholesale price always means manufacturer's price is that an earlier version of section 297F.01, subdivision 23, defined wholesale price only as the manufacturer's price: "the established price for which a manufacturer sells a tobacco product to a distributor." Minn.Stat. § 297F.01, subd. 23 (1998). That statute was amended in 1999 to add the words "or person" after manufacturer. Act of May 25, 1999, ch. 243, art. 7, § 9, 1999 Minn.

Laws 2054, 2166. McLane contends that the 1999 amendment was intended as a clarifying amendment, not as a change of meaning, and therefore, the exclusive reference to the price of the manufacturer in the pre–1999 version was meant to continue in the new version.

We agree that the 1999 amendment adding "or person" to the statute did clarify the meaning of the pre–1999 law. Before the amendment, the meaning of the term wholesale price was the price for which the tobacco products were sold to the tax-liable distributor, which previously had been the direct sales from the manufacturer to the distributor. After the amendment the meaning of wholesale price continued to be the price for which the tobacco products were sold to the tax-liable distributor—but the amendment clarified that the relevant sales price could be that of either a manufacturer or other person.[6]

McLane's argument that the wholesale sales price is the price charged by the manufacturer even when the tobacco products are sold by another person to the tax-liable distributor at a different price is contrary to the plain language of the statute. We hold that the tax court was correct in ruling that under Minn.Stat. § 297F.01, subd. 23 (2002), which was the

---

5. We also note that the three activities used by the legislature to define "tobacco products distributor" in Minn.Stat. § 297F.01, subd. 20, precisely parallel the activities described in Minn.Stat. § 297F.05, subd. 3, as the actions of the distributor that trigger imposition of the tobacco tax. This further reinforces our determination that the legislature intended its references to "distributor" in these statutes to mean the tax-liable distributor.

6. Because we conclude that the post–1999 statute is unambiguous, we need not rely on the legislative history cited by McLane. *See Am. Family Ins. Group v. Schroedl,* 616 N.W.2d 273, 277 (Minn.2000). In any event,

the legislative history cited is entirely consistent with our interpretation of the statute. A legislative bill summary stated: " '[W]holesale price' for the tobacco products tax includes established *prices* (excluding discounts) *set by sellers other than manufacturers.* Present law only refers to purchases from a manufacturer." House Research Bill Summary of H.F. 380 (Feb. 1, 1999) (emphasis added). *See also* 1999 Minn. Dep't of Revenue's Technical Bill Summary of H.F. 380 ("This will clarify that the wholesale price is determined by the sales price of whomever imports the tobacco products into Minnesota whether it is or is not a manufacturer.").

statute in effect for the disputed tax periods of May 2002 through June 30, 2003, the wholesale price on which the tobacco tax was based was the sales price for the tobacco products charged by the person, Sales, to the tax-liable Minnesota distributor, McLane.

### B. Tax years 2003–2005

In 2003, the legislature again amended Minn.Stat. § 297F.01, subd. 23 as follows:

"Wholesale *sales* price" means the ~~established~~ price *stated on the price list in effect at the time of sale* for which a manufacturer or person sells a tobacco product to a distributor, exclusive of any discount, *promotional offer,* or other reduction. *For purposes of this subdivision, "price list" means the manufacturer's price at which tobacco products are made available for sale to all distributors on an ongoing basis.*

Act of May 25, 2003, ch. 127, art. 7, § 5, 2003 Minn. Laws 731, 851. This amended language applies to McLane's claims for the tax period from July 1, 2003, through 2005.

The tax court concluded that the legislature intended the "wholesale sales price" to be the price on Sales's "price list" at the time it sold tobacco products to McLane. The court observed that the language "manufacturer's price" in the second sentence was "problematic," but that it was modified by the phrase "available for sale to all distributors." Because it was undisputed that McLane and other distributors could not purchase tobacco products from Sales at the price that Sales purchased them from Manufacturing, the court concluded that Manufacturing's price to Sales did not fit the definition of "manufacturer's price."

We have previously held that "where the meaning of a taxing statute is doubtful, the doubt must be resolved in favor of the taxpayer." *Charles W. Sexton Co. v. Hatfield,* 263 Minn. 187, 195, 116 N.W.2d 574, 580 (1962). If a tax statute is "'subject to more than one reasonable interpretation'" it is ambiguous, or doubtful. *See Am. Family Ins. Group v. Schroedl,* 616 N.W.2d 273, 277 (Minn.2000) (quoting *Amaral v. St. Cloud Hosp.,* 598 N.W.2d 379, 384 (Minn.1999)); *see also* Minn.Stat. § 645.16. But a tax statute is not doubtful when the legislature's intent is clear. *Winnetka Partners Ltd. v. County of Hennepin,* 538 N.W.2d 912, 914 (Minn.1995). We must therefore examine the language of the statute to determine if there is any ambiguity.

McLane argues that the 2003 amendments unambiguously establish that "price list" means the "manufacturer's price" even if a "person" is the one selling to the tax-liable distributor. McLane contends that the second sentence of the amended version of subdivision 23 defines "price list" for all sales and is not a "narrow exception." Alternatively, McLane argues that there is a conflict between the first and second sentences and that any conflict must be resolved in favor of the taxpayer.

Essentially, the 2003 amendments to subdivision 23 did two things. The legislature changed "established price" in the first sentence to "price stated on the price list at the time of the sale," and it added the second sentence. The question is whether the amendments changed the meaning of "wholesale sales price." We conclude that they did not.

Although the amendment to the first sentence changes "established price" to "price list," the sentence continues to define "wholesale sales price" as the price "for which a manufacturer or person sells a tobacco product to a distributor." Thus, in virtually the same language as the predecessor statute, the first sentence of the

amended version continues to require McLane to pay a tobacco tax at the price "for which" Sales, a "person," sold the tobacco products to McLane, the "distributor."

The crux of McLane's argument is that the second sentence alters the meaning of the first sentence. The second sentence provides that "price list means the manufacturer's price at which tobacco products are made available for sale to all distributors on an ongoing basis." Based on this language, McLane contends that "wholesale sales price," as defined in the first sentence, must be limited to the "manufacturer's price." The concurrence and dissent agrees, concluding that the second sentence makes the distributor's price irrelevant for purposes of the tobacco tax. But the manufacturer's price is not the price "for which" a nonmanufacturer sells the products to the tax-liable distributor. The meaning attributed to the second sentence by McLane therefore conflicts with the plain meaning of the first sentence, a meaning that is carried forward from the previous two versions of the statute.

McLane's proposed interpretation is incomplete because it views the statute piecemeal. But we must look at the definition as a whole and give effect to all of its provisions to determine the intent of the legislature. Minn.Stat. § 645.16.

Based on our review of amended subdivision 23 in its entirety, we conclude that the new term, "price list," in the second sentence does not change the meaning of the first sentence and that the "wholesale price" remains the price for which a "manufacturer" or nonmanufacturer "person" sells tobacco products to a distributor. We construe the second sentence as a condition, or limitation, on the use of a "manufacturer's price list" that applies when the sales to be taxed are made by a manufacturer. Specifically, the "wholesale

sales price" may be determined by a "manufacturer's price list," only if the prices on that price list are prices at which tobacco products "are made available for sale to all distributors on an ongoing basis." In other words, a manufacturer's price list that is available only to certain of the manufacturer's customers cannot serve as the basis for the tobacco tax. This meaning gives effect to the first sentence by basing the "wholesale sales price" on the price for which the actual seller, either a "manufacturer" or a "person," sells tobacco products to a distributor. It gives effect to the second sentence, not by creating a definition that controls all sales, but by ensuring that when the "manufacturer's price list" is used, it is the price that is "available for sale to all distributors on an ongoing basis."

McLane urges us to consider legislative history for assistance in interpreting the statute. Although there is potential conflict between the two sentences of the amended statute, because the interpretation of the second sentence advanced by McLane is unreasonable in light of the language of the first sentence, we conclude that the 2003 version is not ambiguous. *See Schroedl,* 616 N.W.2d at 277 (stating that a statute is ambiguous if there is more than one "reasonable" interpretation). In any event, the legislative history supports our interpretation. Specifically, representatives of the Department of Revenue testified that the amendments to subdivision 23, or any of the other added provisions, were not expected to have any impact on revenue. Hearing on H.F. 759, H. Tax Comm., 82nd Minn. Leg., March 11, 2003 (audio tape) (comments of R. Krause, Dep't of Revenue); Hearing on S.F. 1007, S. Tax Comm., 82nd Minn. Leg., April 1, 2003 (audio tape) (comments of J. Haugen, Dep't of Revenue); *see also* 2003 Minn.

Dep't of Revenue's Technical Bill Summary of H.F. 759 (March 28, 2003).

If the 2003 version of the statute were construed as McLane argues, the shift to exclusive reliance on manufacturer's lower prices for calculation of the tobacco tax would certainly reduce tax revenue. In contrast, our more narrow construction of the added second sentence is consistent with the projection of a revenue-neutral amendment. *Cf. N. States Power Co. v. Comm'r of Revenue*, 571 N.W.2d 573, 575–76 (Minn.1997) (noting Department of Revenue analysis of no revenue impact in support of conclusion that legislation was not meant to substantively change existing definition).

Because we conclude the legislature did not intend its 2003 amendments of subdivision 23 to alter the meaning of wholesale price for purposes of the tobacco tax, we hold that for the tax periods of July 1, 2003, through 2005, the wholesale price for purposes of calculating the tobacco tax was the price for which Sales sold tobacco products to McLane.

## II.

 McLane argues that interpreting Minn.Stat. § 297F.05, subd. 3, to provide that the tobacco tax is calculated using the price that the taxable distributor pays its supplier unconstitutionally discriminates against interstate commerce. The challenge to the constitutionality of a statute is a question of law, which we review de novo. *Westling v. County of Mille Lacs*, 581 N.W.2d 815, 819 (Minn. 1998). We are guided by the presumption that the legislature does not intend to violate the U.S. Constitution; therefore, we must place a construction on the statute that will make it constitutional if at all possible. *Hutchinson Tech., Inc. v. Comm'r of Revenue*, 698 N.W.2d 1, 8 (Minn.2005). A taxpayer challenging the

constitutionality of a state tax statute has a heavy burden to show, beyond a reasonable doubt, that the statute is unconstitutional. *Chapman v. Comm'r of Revenue*, 651 N.W.2d 825, 830 (Minn.2002).

The Commerce Clause provides that "[t]he congress shall have the power ... [t]o regulate Commerce with foreign Nations and among the several states." U.S. Const. art. I, § 8, cl. 3. The Commerce Clause has long been held to impliedly contain a negative command, the "dormant" Commerce Clause, that forbids states from discriminating against or unduly burdening interstate commerce. *Chapman*, 651 N.W.2d at 831 (citing *Quill Corp. v. North Dakota*, 504 U.S. 298, 312, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992)).

 Under a two-prong Commerce Clause inquiry, a court first considers whether a "challenged statute implicates the Commerce Clause and, if it does, then evaluates whether the statute violates the Commerce Clause." *Chapman*, 651 N.W.2d at 831. Transporting goods across state lines implicates the Commerce Clause as it involves "[u]se of the channels of interstate commerce." *See id.* (citing *United States v. Lopez*, 514 U.S. 549, 558–59, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995)). It is undisputed that the tobacco tax implicates the Commerce Clause; therefore, the question is whether the tax violates the Commerce Clause.

 In *Complete Auto Transit v. Brady*, the U.S. Supreme Court adopted a four-part test to determine whether a state's tax system violates the Commerce Clause. 430 U.S. 274, 279, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977), *cited in Chapman*, 651 N.W.2d at 834. "To withstand constitutional scrutiny, a tax must (1) be applied to activity with a substantial nexus with the taxing state, (2) be fairly apportioned, (3) not discriminate against interstate com-

merce, and (4) be fairly related to the services provided by the state." *Chapman*, 651 N.W.2d at 834 (citing *Complete Auto*, 430 U.S. at 279, 97 S.Ct. 1076). McLane contends that the tobacco tax discriminates against interstate commerce in violation of the third prong of the *Complete Auto* test.[7] Such discrimination may occur if a tax is "facially discriminatory, has a discriminatory intent, or has the effect of unduly burdening interstate commerce." *Mayo Collaborative Servs., Inc. v. Comm'r of Revenue*, 698 N.W.2d 408, 412 (Minn.2005) (quoting *Amerada Hess Corp. v. Dir., Div. of Taxation, N.J. Dep't of Treas.*, 490 U.S. 66, 75, 109 S.Ct. 1617, 104 L.Ed.2d 58 (1989)). McLane argues that Minnesota's tobacco tax has a discriminatory effect.

The Commissioner argues that we should not consider McLane's claim because it is based on hypothetical situations. The U.S. Supreme Court has distinguished hypothetical Commerce Clause violations, violations that might occur if a statute were amended in the future, from "in-effect" analysis that considers the effect of the current statutory structure. *See Associated Indus. of Miss. v. Lohman*, 511 U.S. 641, 654, 114 S.Ct. 1815, 128 L.Ed.2d 639 (1994). Therefore, we only review the latter. Here, McLane's claim is not based on a hypothetical, but on the claimed practical effect of an existing statute.

The tax court concluded that the tobacco tax, as applied to McLane, did not discriminate against interstate commerce.[8] The Commissioner argues that McLane's tax liability is higher on its purchases from Sales than on its purchases direct from a manufacturer because of Sales's organiza-

tion model and not because of the tobacco tax statute.

McLane argues that calculating the tax using the price that the taxable distributor pays its supplier discriminates against interstate commerce as such a tax will "fall more heavily on tobacco products involved in out-of-state distribution than those involved in in-state distribution." Thus, McLane argues that the tax more heavily burdens products that travel through interstate commerce and violates the Commerce Clause.

The Commerce Clause prohibits economic protectionism in the form of "regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988). Therefore, " 'a State may not tax a transaction or incident more heavily when it crosses state lines than when it occurs entirely within the State.' " *Am. Trucking Ass'n v. Scheiner*, 483 U.S. 266, 280, 107 S.Ct. 2829, 97 L.Ed.2d 226 (1987) (quoting *Armco Inc. v. Hardesty*, 467 U.S. 638, 642, 104 S.Ct. 2620, 81 L.Ed.2d 540 (1984)).

McLane is correct that calculating the tobacco tax using the price that McLane pays to Sales, instead of the amount that Sales pays to Manufacturing, has the effect of increasing the amount of the tobacco tax that it pays as the tax-liable distributor. McLane relies on *Halliburton Oil Well Cementing Co. v. Reily*, 373 U.S. 64, 83 S.Ct. 1201, 10 L.Ed.2d 202 (1963), to support its position that this effect violates the Commerce Clause. In *Halliburton*, the State of Louisiana imposed a use tax on machinery that was manufactured out-

---

7. McLane does not challenge the other prongs of the *Complete Auto* test, and therefore we do not specifically address them.

8. The tax court noted that the Erie Shuffle was complete on June 29, 2007, pursuant to *Erie Mining Co. v. Comm'r of Revenue*, 343 N.W.2d 261, 264 (Minn.1984).

side of the state and used in the state. 373 U.S. at 65–66, 83 S.Ct. 1201. Unlike the sales tax imposed on machines manufactured in-state, the use tax calculation also included the cost of labor and overhead. *Id.* at 67, 83 S.Ct. 1201. The U.S. Supreme Court reasoned that the Commerce Clause requires "equal treatment for in-state and out-of-state taxpayers similarly situated as a condition precedent for a valid use tax on goods imported from out-of-state." *Id.* at 70, 83 S.Ct. 1201. Thus, the Court struck down the tax because the effect of the tax was to discriminate in favor of local merchants. *Id.* at 71–73, 83 S.Ct. 1201.

We conclude that Minnesota's tobacco tax does not discriminate in favor of local merchants. In contrast to the use tax in *Halliburton,* the tobacco tax does not include additional components in the tax if the tobacco products are manufactured out-of-state. All tobacco products are taxed at the same rate and all are taxed at the time of the first wholesale transaction in Minnesota, regardless of the origin of the products. *See McLane Western,* 126 P.3d at 214–17 (rejecting Commerce Clause challenge to similar tobacco tax).

■■■ McLane contends that the tax court failed to consider its argument that the tax is discriminatory "due to the burden the tax would place on interstate products, rather than taxpayers." But McLane's increased tax obligation is not the result of a tax that discriminates against out-of-state products or favors in-state products, but rather the result of Sales's business decisions to sell its tobacco products at a higher price than Manufacturing sold them. It is Sales's business model, and not the statutory structure, that causes McLane's higher tax obligation. The Commerce Clause does not protect "particular structure[s] or methods of operation in a retail market." *Exxon*

*Corp. v. Governor of Md.,* 437 U.S. 117, 127, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978); *see also Amerada Hess Corp. v. Dir., Div. of Taxation, N.J. Dep't of Treas.,* 490 U.S. 66, 75, 109 S.Ct. 1617, 104 L.Ed.2d 58 (1989) (stating "whatever different effect the add-back provision may have on these two categories of companies results solely from differences between the nature of their businesses, not from the location of their activities.").

Finally, McLane suggests that the tobacco tax encourages out-of-state distributors such as Sales to move into Minnesota in order to compete on equal terms. The central premise of McLane's argument is that if Sales relocated to Minnesota, it would become the in-state tax-liable distributor. Sales would pay the tobacco tax based on the price that it pays to Manufacturing and then resell the product to McLane. This effect, McLane argues, encourages Sales to become a Minnesota distributor.

But McLane does not address how Sales would become the taxable distributor, and it does not address why McLane would exist in such a distribution network. While Sales is a licensed tobacco products distributor in Minnesota, it is currently not the tax-liable distributor because it does not bring tobacco products into Minnesota for sale. In short, McLane's argument is speculative and without any factual basis.

We conclude that Minnesota's tobacco tax does not discriminate in favor of local merchants or local products. It does not result in economic protectionism, but rather taxes tax-liable distributors and products uniformly, and therefore does not violate the Commerce Clause.

Affirmed.

PAGE and MEYER, JJ., took no part in the consideration or decision of this case.

MAGNUSON, Chief Justice (concurring in part, dissenting in part).

I dissent in part from the majority's conclusion that the language of the 2003 amendment had no impact on the way tobacco taxes are calculated.

Up until 1999, a tobacco tax was assessed based on "the established price for which a manufacturer sells a tobacco product to a distributor." Minn.Stat. § 297F.01, subd. 23 (1998). This language reflected the practice of most manufacturers selling their products directly to distributors like McLane. In 1999, the statute was amended to provide that the tax was charged on the wholesale price, defined as "the established price for which a manufacturer *or person* sells a tobacco product to a distributor, exclusive of any discount or other reduction." (Emphasis added). Minn.Stat. § 297F.01, subd. 23 (2002). Act of May 25, 1999, ch. 243, art. 7, § 9, 1999 Minn. Laws 2054, 2166. Under the amended statute, the tobacco tax, previously calculated only on sales made by the manufacturer, would now be calculated based on taxable sales made by a distributor who is not a manufacturer. This language reflected a change in the practice of marketing by tobacco manufacturers. Instead of selling directly to distributors, manufacturers such as USSTC formed sales subsidiaries that sold tobacco products to distributors. These transactions were captured by the amended statutory language.

The legislature changed the statute again in 2003, to more specifically define wholesale price. Under the amended statute, "wholesale sales price" is the "price stated on the price list in effect at the time of sale." Act of May 25, 2003, ch. 127, art. 7, § 5, 2003 Minn. Laws 731, 851. The amended statute further defines "price list" as "the *manufacturer's* price at which tobacco products are made available for all distributors on an on-going basis." *Id.* (emphasis added).

To me, the legislature's language could not be more clear. From 1999 to the effective date of the 2003 amendment, taxes were calculated based on the wholesale sales price charged by either the manufacturer or a distributor selling to a second distributor. For that period of time, McLane was properly assessed taxes based on the price it paid to Sales for its products. However, after the 2003 amendment, the legislature specifically provided that, for purposes of calculating the tax, the wholesale price was what the *manufacturer* charged all of its distributors on an on-going basis. The fact that the manufacturer's distributors charged other distributors a different price is of no moment. I would affirm the tax court's decision with regard to the tax year 2002–2003 but reverse with regard to tax years 2003–2005.

I agree with the majority's analysis of the commerce clause issues, and therefore join in section II of the opinion.