PETTIGREW, J.
|?This is an action for refund of taxes paid under protest by plaintiff, McLane Southern, Inc. (“McLane”), a Mississippi-based company, to the Louisiana Department of Revenue (“Department”). Following cross motions for summary judgment filed by the parties, the trial court granted summary judgment filed by the Department, dismissing, with prejudice, McLane’s claims against the Department. This appeal by' McLane followed. For the reasons set forth below, we affirm.
FACTS AND PROCEDURAL HISTORY
The facts of this case were fully developed in an earlier opinion of this court, *1264 wherein we concluded that there was no specific statute imposing liability on McLane for the payment of the tax levied as to smokeless tobacco products and, thus, McLane was entitled to a refund for the taxes paid under protest. We reversed the trial court’s judgment and determined that the remaining issues were moot. See McLane Southern, Inc. v. Bridges, 2010-1259 (La.App. 1 Cir. 5/6/11), 64 So.3d 886. On September 23, 2011, the Louisiana Supreme Court granted the Department’s writ application. McLane Southern, Inc. v. Bridges, 2011-1141 (La.9/23/11), 70 So.3d 810. Observing that “La. R.S. 47:841, as amended in 2000, imposes a 20 [percent] excise tax on the distribution of smokeless tobacco in this state,” the supreme court interpreted La. R.S. 47:841 and 854 as giving the Department the right to collect a 20 percent excise tax on McLane as the dealer who first distributes smokeless tobacco in this state. So concluding, the supreme court reversed this court’s decision and remanded the case to our court for consideration of McLane’s remaining assignments of error, i.e.: 1) the trial court erred as a matter of law in finding that the “Invoice price” as defined by La. R.S. 47:842(12) upon which the excise tax is imposed should be calculated on the price that McLane pays to its tobacco supplier, rather than the lower manufacturer’s net invoice price as invoiced by the manufacturer to McLane’s tobacco supplier; and 2) the trial court erred as a matter of law in adopting the interpretation of La. R.S. 47:842(12) urged by the Department as this interpretation renders the Tobacco Tax Law unconstitutional under the Dormant Commerce Clause of the United States Constitution by discriminating against out-of-state | ^.wholesalers like McLane. McLane Southern, Inc. v. Bridges, 2011-1141, pp. 11-12 (La.1/24/12), 84 So.3d 479, 486.
DISCUSSION

Standard of Review and General Principles of Summary Judgment

A motion for summary judgment is a procedural device used to avoid a full-scale trial when there is no genuine factual dispute. It should be granted only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and that mover is entitled to judgment as a matter of law. La.Code Civ. P. art. 966(B). The summary judgment procedure is expressly favored in the law and is designed to secure the just, speedy, and inexpensive determination of civil actions. La.Code Civ. P. art. 966(A)(2). Its purpose is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial. Hines v. Garrett, 2004-0806, p. 7 (La.6/25/04), 876 So.2d 764, 769 (per curiam).
On a motion for summary judgment, the burden of proof is on the mover. If, however, the mover will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the mover’s burden on the motion does not require that all essential elements of the adverse party’s claim, action, or defense be negated. Instead, the mover must point out to the court that there is an absence of factual support for one or more elements essential to the adverse party’s claim, action, or defense. Thereafter, the adverse party must produce factual evidence sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial. If the adverse party fails to *1265 meet this burden, there is no genuine issue of material fact, and the mover is entitled to summary judgment. La.Code Civ. P. art. 966(C)(2); Janney v. Pearce, 2009-2103, p. 5 (La.App. 1 Cir. 5/7/10), 40 So.3d 285, 288-289, writ denied, 2010-1356 (La.9/24/10), 45 So.3d 1078.
Summary judgments are reviewed on appeal de novo. An appellate court thus asks the same questions as does the trial court in determining whether summary judgment is appropriate: whether there is any genuine issue of material fact, and 14whether the mover is entitled to judgment as a matter of law. Lewis v. Morgan, 2011-2182, p. 4 (La.App. 1 Cir. 6/8/12), 93 So.3d 741, 744. Because the applicable substantive law determines materiality, whether a particular fact in dispute is material can be seen only in light of the substantive law applicable to the case. Daniels v. USAgencies Cas. Ins. Co., 2011-1357, p. 8 (La.App. 1 Cir. 5/3/12), 92 So.3d 1049, 1055.

Principles of Statutory Interpretation

McLane’s first assignment of error involves the interpretation of La. R.S. 47:841 as It relates to “invoice price” as defined in La. R.S. 47:842(12). Legislative intent is the fundamental question in all cases of statutory interpretation, and rules of statutory construction are designed to ascertain and enforce the intent of the statute. State v. Campbell, 2003-3035, p. 7 (La.7/6/04), 877 So.2d 112, 117. It is presumed that the Legislature enacts each statute with deliberation and with full knowledge of all existing laws on the same subject. Id., 2003-3035 at 8, 877 So.2d at 117. Thus, legislative language will be interpreted on the assumption that the Legislature was aware of existing statutes, rules of construction, and judicial decisions interpreting those statutes. It is further presumed that the Legislature intends to achieve a consistent body of law. Id.
 The starting point in the interpretation of any statute Is the language of the statute itself. When a law is dear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the Legislature. In re Clegg, 2010-0323, p. 20 (La.7/6/10), 41 So.3d 1141, 1154. The meaning and intent of a law is determined by considering the law in its entirety and all other laws on the same subject matter and by placing a construction on the law that is consistent with the express terms of the law and with the obvious intent of the Legislature in enacting the law. Id., 2010-0323 at 21, 41 So.3d at 1154.
In interpreting the Revised Statutes, “[w]ords and phrases shall be read with their context and shall be construed according to the common and approved usage of |5the language.” La. R.S. 1:3. When the wording of a section of the Revised Statutes “is clear and free of ambiguity, the letter of it shall not be disregarded under the pretext of pursuing Its spirit.” La. R.S. 1:4.

What is Invoice Price?

The first Issue for our review is the proper interpretation of invoice price as the benchmark that sets the tax base for the tobacco tax on smokeless tobacco. As set forth In La. R.S. 47:841, the amount of tax levied on smokeless tobacco is “twenty percent of the invoice price as defined in this Chapter.” La. R.S. 47:841(E). Pursuant to La. R.S. 47:842, “[i]nvoice price” is defined, in part, as “the manufacturers net invoiced price as invoiced to the Louisiana tobacco dealer, by the manufacturer, *1266 jobber, or other persons engaged in selling tobacco products.” La. R.S. 47:842(12).
According to the record, McLane purchases its smokeless tobacco products from its supplier, U.S. Smokeless Tobacco Brands, Inc. (“UST-Sales”), which is an affiliate of U.S. Smokeless Tobacco Manufacturing Company (“UST-Manufacturing”).[1] UST-Manufacturing sells to UST-Sales the smokeless tobacco products that UST-Sales then sells to McLane. All of these sales occur outside of Louisiana. McLane then sells the smokeless tobacco products to its customers, which are primarily grocery stores and small convenience stores in Louisiana.
McLane argues on appeal that the applicable statutes clearly provide that the 20 percent smokeless tobacco tax applies to the manufacturer’s net invoiced price, which in its distribution chain is the price at which UST-Sales purchased the smokeless tobacco from UST-Manufacturing. McLane asserts that UST-Sales is not a manufacturer and, thus, the price at which it sells the products to McLane cannot be the manufacturer’s net invoiced price. In the alternative, McLane argues that any ambiguity in La. R.S. 47:842(12) must be construed in favor of McLane.
|fiThe Department asserts, and the trial court agreed, that the invoice price as defined in La. R.S. 47:842(12) is the price McLane pays to UST-Sales, not the price UST-Manufacturing charges UST-Sales. The Department argues that “it is clear that the [Legislature intended that the price that would set the base would be a sale from either (1) a manufacturer, (2) a jobber, or (3) other persons engaged in selling tobacco products.” (Emphasis in original.) Thus, the Department maintains, “the purchase of tobacco products from any of these three entities can constitute the taxable ‘invoice price.’ ” (Emphasis in original.) The Department points out that before UST-Sales sold the product in question to McLane, it purchased the smokeless tobacco products from UST-Manufacturing. UST-Sales then resold the smokeless tobacco products to McLane at a higher price. This, the Department argues, brings UST-Sales clearly within the classification of a “jobber, or other [person] engaged In selling tobacco products” as is contemplated in La. R.S. 47:842(12).
Applying the above legal precepts to this ease, and having thoroughly reviewed the evidence in the record, we agree with the Department that the base for the 20 percent tax on the smokeless tobacco products is the price McLane paid to UST-Sales, not the price UST-Sales paid to UST-Manufacturing. The language in La. R.S. 47:842(12) is “clear and unambiguous,” and its application herein does not lead to absurd consequences. The price as invoiced to the Louisiana tobacco dealer by the manufacturer, jobber, or other persons engaged in selling tobacco products sets the tax base. Thus, the statute must be applied as written, and no further interpretation may be made in search of the Legislature’s intent. In re Clegg, 2010-0323 at 20, 41 So.3d at 1154.

*1267
Does Louisiana’s Tobacco Tax Violate the Commerce Clause?

McLane next argues that the trial court erred in adopting an interpretation of La. R.S. 47:842(12) that renders the statute unconstitutionally discriminative against interstate commerce.
In determining the constitutionality of the statute at issue, it is important to keep certain principles in mind. It is well settled that statutes are presumed constitutional 17unless fundamental rights, privileges, and immunities are involved. This presumption is especially forceful in the case of statutes enacted to promote a public purpose, such as statutes relating to taxation and public finance. World Trade Center Taxing Dist. v. All Taxpayers, Property Owners, 2005-0374, p. 11 (La.6/29/05), 908 So.2d 623, 632. Because of the presumption of a statute’s constitutionality, the party challenging the statute bears the burden of proving its unconstitutionality. Wooley v. State Farm Fire and Cas. Ins. Co., 2004-0882, p. 19 (La.1/19/05), 893 So.2d 746, 762.
The Commerce Clause of the United States Constitution gives to Congress the power “[t]o regulate Commerce ... among the several States.” U.S. Const. Art. I, § 8, cl. 3. The Commerce Clause has been interpreted to carry a negative implication known as the dormant Commerce Clause, which seeks to prevent States from engaging in economic protectionism by economically benefitting instate interests while burdening out-of-state competitors. See Department of Revenue of Ky. v. Davis, 553 U.S. 328, 337-338, 128 S.Ct. 1801, 1808, 170 L.Ed.2d 685 (2008); New Energy Co. of Indiana v. Limbach, 486 U.S. 269, 273-274, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988). “[I]n the absence of actual or prospective competition between the supposedly favored and disfavored entities in a single market there can be no local preference, whether by express discrimination against interstate commerce or undue burden upon it, to which the dormant Commerce Clause may apply.” General Motors Corp. v. Tracy, 519 U.S. 278, 300, 117 S.Ct. 811, 825, 136 L.Ed.2d 761 (1997). In the instant matter, McLane argues that under the trial court’s interpretation of La. R.S. 47:842(12), the “ ‘shifting tax base’ rewards the location of economic activity in Louisiana and penalizes the location of activity in other states,” thus discriminating “against interstate commerce in violation of the Commerce Clause.”
In determining whether a state tax violates the dormant Commerce Clause, the United States Supreme Court has used a four-part test. A State tax will not be sustained “unless the tax: (1) has a substantial nexus with the State; (2) is fairly apportioned; (3) does not discriminate against interstate commerce; and (4) is fairly ^related to the services provided by the State.” Maryland v. Louisiana, 451 U.S. 725, 754, 101 S.Ct. 2114, 2133, 68 L.Ed.2d 576 (1981).
McLane maintains that the smokeless tobacco tax statute violates the third prong of the four-part test, in that the statute discriminates against interstate commerce. A state tax is discriminatory against interstate commerce “if it is facially discriminatory, has a discriminatory intent, or has the effect of unduly burdening interstate commerce.” Amerada Hess Corp. v. Director, Div. of Taxation, New Jersey Dept. of Treasury, 490 U.S. 66, 75, 109 S.Ct. 1617, 1623, 104 L.Ed.2d 58 (1989).
*1268 In a previous case dealing with similar issues, the Colorado Court of Appeals found the tobacco tax statutes, as they applied to the transactions between McLane Western and UST-Sales, to be constitutional under the Commerce Clause:
[W]hile the tax here is imposed based on the price paid by the taxable distributor, neither [UST-Manufacturing] or [UST-Sales] is encouraged to move into the state because they might well become the taxable distributor. The tax is imposed on an activity within the state, the sale and distribution of [other tobacco products], not on the product or the distribution network. The fact that the tax base calculated on the price paid by the taxable distributor may place the product at a competitive disadvantage in the marketplace because the higher tax is added to the price does not, in our view, render the tax unconstitutional under the Commerce Clause. All taxable distributors of [other tobacco products] are taxed at the same rate and on a tax base determined in the same fashion.
McLane Western, Inc. v. Department of Revenue, 126 P.3d 211, 216 (Colo.App.2005), cert. denied, 2006 WL 349788 (Colo.2006), cert. denied, 549 U.S. 810, 127 S.Ct. 42, 166 L.Ed.2d 18 (2006).
Subsequently, in McLane Minnesota, Inc. v. Commissioner of Revenue, 773 N.W.2d 289 (Minn.2009), McLane’s arguments regarding the Commerce Clause were again dismissed, this time by the Minnesota Supreme Court:
The Commerce Clause prohibits economic protectionism in the form of “regulatory measures designed to benefit instate economic interests by burdening out-of-state competitors.” Therefore, “ ‘a State may not tax a transaction or incident more heavily when it crosses state lines than when it occurs entirely within the State.’ ”
McLane is correct that calculating the tobacco tax using the price that McLane pays to [UST-Sales], instead of the amount that [UST-Sales] pays to [UST-Manufacturing], has the effect of increasing the amount of the tobacco tax that it pays as the tax-liable distributor. McLane relies on Halliburton Oil Well Cementing Co. v. Reily, 373 U.S. 64, 83 S.Ct 1201, 10 L.Ed.2d 202 (1963), to support its position that this effect violates the Commerce Clause. In Halliburton, the State of Louisiana imposed a use tax on machinery that was manufactured outside of the state and used in the state. Unlike the sales tax imposed on machines manufactured in-state, the use tax calculation also included the cost of labor and overhead. The U.S. Supreme Court reasoned that the Commerce Clause requires “equal treatment for in-state and out-of-state taxpayers similarly situated as a condition precedent for a valid use tax on goods imported from out-of-state.” Thus, the Court struck down the tax because the effect of the tax was to discriminate in favor of local merchants.
We conclude that Minnesota’s tobacco tax does not discriminate in favor of local merchants. In contrast to the use tax in Halliburton, the tobacco tax does not include additional components in the tax if the tobacco products are manufactured out-of-state. All tobacco products are taxed at the same rate and all are taxed at the time of the first wholesale transaction in Minnesota, regardless of the origin of the products.
McLane contends that the tax court failed to consider its argument that the tax is discriminatory “due to the burden *1269 the tax would place on interstate products, rather than taxpayers.” But McLane’s increased tax obligation is not the result of a tax that discriminates against out-of-state products or favors in-state products, but rather the result of [UST-Sales’] business decisions to sell its tobacco products at a higher price than [UST-Manufacturing] sold them. It is [UST-Sales’] business model, and not the statutory structure, that causes McLane’s higher tax obligation. The Commerce Clause does not protect “particular structure^] or methods of operation in a retail market.”
Finally, McLane suggests that the tobacco tax encourages out-of-state distributors such as [UST-Sales] to move into Minnesota in order to compete on equal terms. The central premise of McLane’s argument is that if [UST-Sales] relocated to Minnesota, it would become the in-state tax-liable distributor. [UST-Sales] would pay the tobacco tax based on the price that it pays to [UST-Manufacturing] and then resell the product to McLane. This effect, McLane argues, encourages [UST-Sales] to become a Minnesota distributor.
But McLane does not address how [UST-Sales] would become the taxable distributor, and it does not address why McLane would exist in such a distribution network. While [UST-Sales] is a licensed tobacco products distributor in Minnesota, it is currently not the tax-liable distributor because it does not bring tobacco products into Minnesota for sale. In short, McLane’s argument is speculative and without any factual basis.
We conclude that Minnesota’s tobacco tax does not discriminate in favor of local merchants or local products. It does not result in economic protectionism, but rather taxes tax-liable distributors and products uniformly, and therefore does not violate the Commerce Clause.
McLane Minnesota, Inc., 773 N.W.2d at 299-300 (citations omitted).
In the instant case, McLane once again argues these same points regarding the discriminatory nature of the interpretation of the tobacco tax statutes as adopted by the Imtrial court below. Having thoroughly reviewed the record before us and the applicable statutes and jurisprudence, we conclude that McLane has failed in its burden of proving that the application of the tobacco tax statutes as interpreted by the trial court would violate the Commerce Clause and render them unconstitutional. As pointed out by the Department in brief to this court: “The tax is assessed against the first dealer who causes tobacco products to be in Louisiana for sale or distribution, and the tax is assessed at the same rate.” The Department notes that this is true regardless of where the products originate, i.e., “whether the person manufactures the products for sale in the state, brings the products into the state, or causes the products to be brought into the state.” Much like the scenario in McLane Minnesota, Inc., McLane’s increased tax obligation in the instant case is “not the result of a tax that discriminates against out-of-state products or favors in-state products,” but rather due to the change in pricing by McLane’s supplier, UST-Sales. McLane Minnesota, Inc., 773 N.W.2d at 300. “It is [UST-Sales’] business model, and not the statutory structure, that causes McLane’s higher tax obligation. The Commerce Clause does not protect ‘particular structure^] or methods of operation in a retail market.’ ” Id.
*1270 CONCLUSION
For the above and foregoing reasons, we affirm the trial court’s judgment below and assess all costs associated with this appeal against McLane Southern, Inc.
AFFIRMED.
KUHN, J., dissents & assigns reasons.

. McLane also purchases smokeless tobacco products from Conwood Sales Company, LLC, which acquires the tobacco products it sells to McLane from an affiliated manufacturer, Conwood Company, LLC. The relationship and transactions among Conwood Sales Company, LLC, Conwood Company LLC, and McLane, for purposes of this appeal, are identical to those among UST-Sales, UST-Manufacturing, and McLane. Therefore, all references herein to UST-Sales include Conwood Sales Company, LLC, and all references to UST-Manufacturing include Conwood Company, LLC.