PETTIGREW, J.
 

 |2In this case, plaintiffs, Mae Mason Jan-ney, Sandra Mason Chamberlain, Teresia Mason Babin, Diane Mason Thompson, Penny Mason Bryant, Gary Mason, Clifton Mason, Robert Mason, and Kerry Mason, the surviving children of Maggie Lois Mason, challenge the trial court’s judgment granting partial summary judgment in favor of defendant, Dr. Katherine Pearce, and dismissing, with prejudice, their claims
 
 *287
 
 for wrongful death. For the reasons that follow, we reverse and remand for further proceedings.
 

 FACTS AND PROCEDURAL HISTORY
 

 According to the record, Maggie Lois Mason (hereinafter referred to as “decedent”), fell from her bed and struck her head either during the late night hours of November 20, 2004, or the early morning hours of November 21, 2004. Later that afternoon, she started complaining of severe headaches. Moreover, as indicated in the affidavits of three of her daughters, decedent sustained a black eye from the fall. On November 24, 2004, decedent presented to Dr. Pearce with complaints of left sided facial pain and headaches. Decedent related the story of the fall, but denied any trauma. Dr. Pearce diagnosed decedent with sinusitis, prescribed antibiotics and Darvocet for sinus discomfort, gave decedent an intramuscular shot of DepoMedrol, and instructed decedent to discontinue the use of Coumadin (a drug that thins the blood to prevent clotting) because of concerns about a possible reaction with the antibiotic.
 

 Later that day, decedent was found in her apartment unconscious and completely unresponsive. She was transferred to Our Lady of the Lake Regional Medical Center by ambulance where she was noted to have a black eye. Decedent underwent CT scanning that showed a very large left temporal frontal subdural hematoma with herniation. Decedent died the following morning. The death certificate lists the cause of death as intracranial hemorrhage.
 

 Plaintiffs filed a complaint against Dr. Pearce with the Patients Compensation Fund. On July 25, 2006, a medical review panel unanimously opined that the evidence did not support a finding that Dr. Pearce had failed to meet the applicable standard of care. The panel further found that Dr. Pearce made a reasonable diagnosis based on the symptoms |spresented by decedent at the time of her visit. Despite the panel’s findings, plaintiffs filed a petition alleging both a wrongful death and survival action against Dr. Pearce. Plaintiffs argued Dr. Pearce deviated below the appropriate standards of care in the following non-exclusive ways: (1) failure to conduct a proper and thorough physical examination; (2) failure to order radiological studies; (3) failure to understand and react to the complaints of headache and obvious black eye in a geriatric patient with a recent history of falling; and (4) failure to react to a regimen of Coumadin therapy in light of recent head trauma.
 

 In response to plaintiffs’ petition for damages, Dr. Pearce filed the subject motion for partial summary judgment alleging that there were no genuine issues of material fact as to plaintiffs’ wrongful death claim against Dr. Pearce and that she was entitled to partial summary judgment as a matter of law. Dr. Pearce argued that plaintiffs’ expert would not be able to establish that decedent’s death was caused by any action or inaction of Dr. Pearce, and thus, plaintiffs cannot carry their burden of proof at trial. Dr. Pearce maintained that plaintiffs could only provide evidence to the effect that but for any alleged negligence on the part of Dr. Pearce, decedent may have had a better chance of surviving. Attached to her partial motion for summary judgment were the following exhibits: (1) the opinion of the medical review panel; (2) plaintiffs’ petition for damages; (3) the deposition of Dr. Jerry W. Bush; (4) the affidavit of one of the members of the medical review panel; and (5) the affidavit of Dr. Pearce.
 

 Plaintiffs filed an opposition to the motion for partial summary judgment, arguing that this was not a matter for sum
 
 *288
 
 mary judgment. Plaintiffs alleged that the issue as to whether decedent suffered a wrongful death because of the negligence of Dr. Pearce or suffered a loss of a chance of survival cannot be determined on a motion for summary judgment. In support of their position, plaintiffs introduced the following exhibits: (1) the curriculum vitae of Dr. Jerry W. Bush; (2) affidavit and deposition of Dr. Jerry W. Bush; (3) the affidavit of Mae Janney, decedent’s daughter; (4) the affidavit of Penny Bryant, decedent’s daughter; (5) the affidavit of Tere-sia Babin, decedent’s daughter; (5) copies of |4the emergency room records from Our Lady of the Lake Regional Medical Center; and (6) copies of Dr. Pearce’s office notes from decedent’s chart.
 
 [1]
 

 On May 11, 2009, the trial court heal’d arguments on the motion for partial summary judgment. After considering the applicable law and the evidence in the record, the trial court granted Dr. Pearce’s motion for partial summary judgment, dismissing plaintiffs’ claims for wrongful death, with prejudice. A judgment in accordance with the trial court’s findings was signed on June 12, 2009. It is from this judgment that plaintiffs have appealed, assigning the following specifications of error:
 
 [2]
 

 1. The Trial Court erred in holding a
 
 “wrongful death”
 
 claim is reduced to ...
 
 “a loss of a chance of survival claim
 
 ” in a Motion for Summary Judgment. This judgment does not deal with material issues of fact, but, instead, assesses damages in a summary proceeding.
 

 2. The Trial Court erred in holding that the record supports the conclusion that [decedent] had less than a 50% chance of survival had proper medical intervention been made where there is no evidence on the issue of damages.
 

 SUMMARY JUDGMENT
 

 A motion for summary judgment is a procedural device used to avoid a full scale trial when there is no genuine issue of material fact.
 
 Gonzales v. Kissner,
 
 2008-2154, p. 4 (La.App. 1 Cir. 9/11/09), 24 So.3d 214, 217. Summary judgment is properly granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that mover is entitled to judgment as a matter of law. La.Code Civ. P. Art. 966(B). Summary judgment is favored and is designed to secure the just, speedy, and inexpensive determination of every action. La.Code Civ. P. art. 966(A)(2);
 
 Aucoin v. \hRochel,
 
 2008-1180, p. 5 (La.App. 1 Cir. 12/23/08), 5 So.3d 197, 200,
 
 unit denied,
 
 2009-0122 (La.3/27/09), 5 So.3d 143.
 

 On a motion for summary judgment, the burden of proof is on the mover. If, however, the mover will not bear the burden of proof at trial on the matter that is before the court on the motion for sum
 
 *289
 
 mary judgment, the mover’s burden on the motion does not require that all essential elements of the adverse party’s claim, action, or defense be negated. Instead, the mover must point out to the court that there is an absence of factual support for one or more elements essential to the adverse party’s claim, action, or defense. Thereafter, the adverse party must produce factual evidence sufficient to establish that he will be able to satisfy his evidentia-ry burden of proof at trial. If the adverse party fails to meet this burden, there is no genuine issue of material fact, and the mover is entitled to summary judgment. La.Code Civ. P. art. 966(C)(2);
 
 Robles v. ExxonMobile,
 
 2002-0854, p. 4 (La.App. 1 Cir. 3/28/03), 844 So.2d 339, 341.
 

 In determining whether summary judgment is appropriate, appellate courts review evidence
 
 de novo
 
 under the same criteria that govern the trial court’s determination of whether summary judgment is appropriate.
 
 Boudreaux v. Vankerkhove,
 
 2007-2555, p. 5 (La.App. 1 Cir. 8/11/08), 993 So.2d 725, 729-730. An appellate court thus asks the same questions as does the trial coui’t in determining whether summary judgment is appropriate: whether there is any genuine issue of material fact, and whether the mover-appellant is entitled to judgment as a matter of law.
 
 Ernest v. Petroleum Service Corp.,
 
 2002-2482, p. 3 (La.App. 1 Cir. 11/19/03), 868 So.2d 96, 97,
 
 writ denied,
 
 2003-3439 (La.2/20/04), 866 So.2d 830.
 

 In ruling on a motion for summary judgment, the trial court’s role is not to evaluate the weight of the evidence or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact.
 
 Guardia v. Lakeview Regional Medical
 
 Center; 2008-1369, p. 3 (La.App. 1 Cir. 5/8/09), 13 So.3d 625, 628. A trial court cannot make credibility decisions on a motion for summary judgment.
 
 Monterrey Center, LLC v. Education Partners, Inc.,
 
 2008-0734, p. 10 (La.App. 1 | ,;Cir. 12/23/08), 5 So.3d 225, 232. In deciding a motion for summary judgment, the trial court must assume that all of the witnesses are credible.
 
 Independent Fire Ins. Co. v. Sunbeam Corp.,
 
 99-2181, pp. 16-17 (La.2/29/00), 755 So.2d 226, 236. Despite the legislative mandate that summary judgments are now favored, factual inferences reasonably drawn from the evidence must be construed in favor of the party opposing the motion, and all doubt must be resolved in the opponent’s favor.
 
 Willis v. Medders,
 
 2000-2507, p. 2 (La.12/8/00), 775 So.2d 1049, 1050.
 

 In
 
 Smith v. Our Lady of the Lake Hosp., Inc.,
 
 93-2512, p. 27 (La.7/5/94), 639 So.2d 730, 751, the Louisiana Supreme Court set forth the following parameters for determining whether an issue is genuine or a fact is material.
 

 A “genuine issue” is a “triable issue.” More precisely, “[a]n issue is genuine if reasonable persons could disagree. If on the state of the evidence, reasonable persons could reach only one conclusion, there is no need for a trial on that issue. Summary judgment is the means for disposing of such meretricious disputes.” In determining whether an issue is “genuine,” courts cannot consider the merits, make credibility determinations, evaluate testimony or weigh evidence. “Formal allegations without substance should be closely scrutinized to determine if they truly do reveal genuine issues of fact.”
 

 A fact is “material” when its existence or nonexistence may be essential to plaintiffs cause of action under the applicable theory of recovery. “[F]acts are material if they potentially insure or preclude recovery, affect a litigant’s ultimate success, or determine the outcome of the legal dispute.” Simply put, a
 
 *290
 
 “material” fact is one that would matter on the trial on the merits. Any doubt as to a dispute regarding a material issue of fact must be resolved against granting the motion and in favor of a trial on the merits. [Citations omitted.]
 

 Because it is the applicable substantive law that determines materiality, whether a particular fact in dispute is material can be seen only in light of the substantive law applicable to this case.
 
 Guardia,
 
 2008-1369 at 4, 13 So.3d at 628.
 

 In a medical malpractice action against a physician, the plaintiff must establish by a preponderance of the evidence the applicable standard of care, a violation of that standard of care, and a causal connection between the alleged negligence and the plaintiffs injuries resulting therefrom. La. R.S. 9:2794(A);
 
 Pfiffner v. Correa,
 
 94-0924, p. 8 (La.10/17/94), 643 So.2d 1228, 1233.
 

 |7To meet this burden of proof, the plaintiff generally is required to produce expert medical testimony.
 
 Lefort v. Venable,
 
 95-2345, p. 4 (La.App. 1 Cir. 6/28/96), 676 So.2d 218, 220. Although the jurisprudence has recognized exceptions in instances of obvious negligence, these exceptions are limited to “instances in which the medical and factual issues are such that a lay jury can perceive negligence in the charged physician’s conduct as well as any expert can.”
 
 Pfiffner,
 
 94-0924 at 9, 643 So.2d at 1234. The jurisprudence has thus recognized that “an expert witness is generally necessary as a matter of law to prove a medical malpractice claim.”
 
 Williams v. Metro Home Health Care Agency, Inc.,
 
 2002-0534, p. 5 (La.App. 4 Cir. 5/8/02), 817 So.2d 1224, 1228. Moreover, the jurisprudence has held that this requirement of producing expert medical testimony is especially apt when the defendants have filed summary judgment motions and supported such motions with expert opinion evidence that their treatment met the applicable standard of care.
 
 Lee v. Wall,
 
 31,468, p. 4 (La.App. 2 Cir. 1/20/99), 726 So.2d 1044, 1046-1047.
 

 DISCUSSION
 

 In moving for summary judgment, Dr. Pearce argued that there was absolutely no evidence that her conduct caused decedent’s death. Dr. Pearce further asserted plaintiffs did not have the expert testimony needed to prove that her actions or inac-tions caused decedent’s death. Accordingly, Dr. Pearce maintained, without proof of the required element of causation, plaintiffs were unable to establish their wrongful death claim against her.
 

 In support of her position, Dr. Pearce submitted the affidavit of Dr. Brad Smith, a member of the medical review panel that considered this matter, who specifically opined that “[n]o action or inaction on the part of Dr. Katherine Pearce caused or contributed to [decedent’s] death.” In addition, Dr. Pearce relied on the following deposition testimony of plaintiffs’ expert, Dr. Bush.
 

 Q. Okay. Do you agree with me — what was the cause of death of [decedent]?
 

 A. The actual mechanism of death?
 

 IsQ. Uh-huh (affirmative).
 

 A. Was cardiovascular arrest or collapse because of the increased pressure from the subdural causing herniation of the brain stem and pressure on it, and that’s what controls respiration and heart rate, heart beat.
 

 Q. Okay. And the subdural hematoma, you believe, was not a spontaneous one but was one which occurred as a result of the fall?
 

 A. Correct.
 

 Q. That’s your opinion, correct?
 

 A. Correct.
 

 
 *291
 
 Q. Then the event that caused her death, would it be fair — would it be your opinion the direct cause of her death was the fall, which you believe caused the subdural, which caused the compression of the brain stem, which caused the respiratory and cardiac arrest?
 

 A. Yes.
 

 Q. Okay. Dr. Pearce’s care did not cause the bleed that led to that sequella of events, did it?
 

 A. That’s correct.
 

 Q. Dr. Pearce’s care didn’t cause [decedent’s] death, did it?
 

 A. There’s nothing actively that she did to cause the death, obviously; it’s, you know, my opinion, the omission or failure to take certain actions as we’ve gone over today.
 

 Q. Okay. But just so I’m clear, because with your legal studies and the system, what you’re really saying, I believe, is that the failure to do what you believe the standard of care required Dr. Pearce to do may have cost [decedent] a chance of survival?
 

 A. The failure to do certain things?
 

 Q. Yes.
 

 A. Yes.
 

 Q. Okay. In other words even had the CT been done, you can’t guarantee that [decedent] would have survived, can you?
 

 A. I cannot guarantee 100 percent, no.
 

 Q. I mean, can you really say one way or another whether she would have survived had the CT been done?
 

 A. I can say that her chances of survival would have been increased if it were done earlier.
 

 |flQ. Okay. Can you tell me how much her chance of survival would have been increased?
 

 A. No.
 

 Plaintiffs, on the other hand, opposed the motion for partial summary judgment arguing that to sort out the complexities of diagnosing and treating a subdural hema-toma, expert testimony must be weighed and conclusions drawn. Plaintiffs alleged that this is not the province of the summary procedure.
 

 In support of their position, plaintiffs point to the affidavit of Dr. Bush wherein Dr. Bush opined that Dr. Pearce’s breach of the applicable standards of medical care, i.e., the failure to diagnose decedent’s brain hemorrhage, was a proximate cause of her death. Dr. Bush further added that “[w]ithin a reasonable degree of medical certainty, if not for the failure of Dr. Pearce to diagnose the brain hemorrhage, [decedent] would not have died at this time.” Plaintiffs also point to excerpts from Dr. Bush’s deposition to illustrate the entire context of Dr. Bush’s opinion regarding this case:
 

 Q. ... What I’m really interested in learning first from you are all of your opinions regarding what the standard of care required and what opinions you have regarding breach of any standard of care.
 

 A. Okay. Overall it’s that a patient presenting after trauma to the head on chronic anticoagulation therapy, the physician should have a very high index of suspicion and be proactive, you know, listening and evaluating and checking on possible intracerebral or intracranial bleeding because of the, you know, obviously increased likelihood of the bleeding in somebody that’s on Coumadin therapy and is fully anticoagulated.
 

 Q. Okay. All right. And then — so that’s the primary one as far as the internal medicine issue, except that you then add to that the Bactrim issue? In other words in your opinion she should not have prescribed Bactrim?
 

 
 *292
 
 A. Correct.
 

 Q. Okay. Any other opinions that you hold or will express regarding any breach of the standard of care by Dr. Pearce?
 

 A. Well, it kind of relates back to the first one but when [decedent] was seen in the office on that day and she diagnosed her with sinusitis and gave her Depo-Medrol, which is a steroid, if Dr. Pearce had done an evaluation for possible intracranial bleeding in a patient fully anticoagulated, she wouldn’t or shouldn’t have given Depo-Medrol because of its tendency to increase the PT and INR, thereby making the blood thinner than it would be otherwise.
 

 Q. Okay. Anything else?
 

 _b- • • •
 

 Q. ... So two of them you have issues with medication she provided and then the initial one being the failure to institute an examination for intracranial or subdural bleeding?
 

 A. Yes. And that would of course include, encompass, doing a thorough neu-rologic examination.
 

 Q. Doctor, let’s start talking about your opinions here as far as the standard of care. Your first opinion is that a more thorough neurological examination or evaluation should have been instituted for bleeding, correct?
 

 A. Correct.
 

 Q. ... What should have been done in your opinion?
 

 A. When a patient such as [decedent] comes in — especially an elderly patient; she was, I believe, 80 years old — comes in with a history of an injury, head injury, and they’re on Coumadin, fully anticoagulated, a radiologic study such as a CAT scan should be done to rule out any intracranial bleeding, especially subdural hematoma which are known to be surgically correctable with return of normal neurologic function in many people that have the surgery done.
 

 Q. And in her case she ultimately developed a subdural hematoma?
 

 A. Yes.
 

 Q. ... [I]t is your opinion that the standard of care required Dr. Pearce to order a CAT scan of [decedent’s] head on November 24th of 2004?
 

 A. Yes.
 

 Q. And that the standard of care required that because she was a patient who was fully anticoagulated and she had had a history of a complaint of an injury to her head?
 

 A. Yes, her age, anticoagulation status, and the injury.
 

 Q. ... [D]o you have to have any symptoms for the standard of care to require a CT or is the history that you just described sufficient?
 

 A. The history’s sufficient.
 

 Q. Okay. So even in the absence of any neurologic symptoms the standard of care, in your opinion, requires a CT? A. Yes. And you want to catch it at a level — at a time before that would happen, before any sequella of the actual bleed would happen.
 

 |nIn addition to Dr. Bush’s testimony, plaintiffs also introduced three of their own affidavits attesting to the fact that their mother sustained a black eye when she fell from her bed and struck her head, that she began experiencing severe headaches, and that she went to see Dr. Pearce on November 24, 2004, with complaints relating to the fall and the severe headaches she had been having. The emergency room records from Our Lady of the Lake Regional Medical Center also reflect that upon admission, decedent had a black eye. Dr. Pearce’s records do not contain any reference to a black eye.
 

 
 *293
 
 On appeal, plaintiffs contend it is obvious from the trial court’s written reasons for judgment that it focused on weighing the evidence presented in the record rather than ruling on the issue presented in the motion. Plaintiffs point to the following conclusion made by the trial court in its written reasons in support of their position that the trial court made impermissible determinations of credibility in this summary judgment proceeding: “Notably, the only fact witness to the circumstances surrounding Dr. Pearce’s evaluation of [decedent’s] condition is Dr. Pearce. In her affidavit, and office notes, she explains [decedent’s] medical history, and specifically refutes the allegation that [decedent] came to her with complaints related to the fall.” Further, with regard to Dr. Bush’s deposition testimony, the trial court stated in its written reasons as follows: “Dr. Bush offers opinion testimony in his deposition, but in summary, whatever opinion Dr. Bush offers is based upon a hypothetical set of facts which are both inconsistent with and contradicted by the actual facts supported in the record.” Based on these conclusions, the trial court ultimately found that there was no genuine issue of material fact regarding plaintiffs’ wrongful death claim.
 

 Following an exhaustive review of the applicable law and evidence herein, we disagree with the trial court’s finding regarding plaintiffs’ wrongful death claim. As previously indicated, any doubt as to a dispute regarding a material issue of fact must be resolved against granting a motion for summary judgment and in favor of a trial on the merits. Moreover, in deciding a motion for summary judgment, the trial court cannot make credibility determinations, evaluate testimony, or weigh evidence.
 
 See
 
 | 12Smith, 93-2512 at 27, 639 So.2d at 751. In the instant case, the question is whether Dr. Pearce breached the applicable standard of care in treating decedent prior to her death. The evidence before the trial court sufficiently raised genuine issues of material fact for the trier of fact to consider when determining whether plaintiffs have satisfied their burden of proof required in a medical malpractice action. Resolution of these unresolved issues is essential to plaintiffs’ wrongful death claim against Dr. Pearce. The trial court erred in granting partial summary judgment in favor of Dr. Pearce because doing so required the trial court to decide disputed genuine issues of material fact and to make credibility determinations, both of which should have been reserved to the trier of fact. Summary judgment was inappropriate.
 

 CONCLUSION
 

 For the above and foregoing reasons, we reverse the trial court’s June 12, 2009 judgment, granting partial summary judgment in favor of Dr. Pearce and dismissing plaintiffs’ wrongful death claims with prejudice, and remand the matter for further proceedings consistent with this opinion. All costs associated with this appeal are assessed against Dr. Pearce.
 

 REVERSED AND REMANDED.
 

 GUIDRY, J., concurs.
 

 [1]
 

 . Also attached to plaintiffs' opposition was a letter from Dr. Nelson Tang, an Assistant Professor of Emergency Medicine at John Hopkins University School of Medicine. However, because that letter was not in the form of an affidavit, it was not considered by the trial court for purposes of the motion for partial summary judgment and will not be considered by this court on review of same.
 

 [2]
 

 .
 
 We note that plaintiffs focus their appeal mainly on the difference between a wrongful death claim and a "loss chance of survival claim,” arguing that the latter is merely an assessment of damages and is not amenable to a motion for summary judgment. However, because we ultimately conclude the trial court improperly evaluated the weight of the evidence and made credibility determinations in granting partial summary judgment below, we need not reach the merits of plaintiffs' assignments of error in our review of this matter.