11ATTORNEY DISCIPLINARY PROCEEDINGS
PER CURIAM.*
This disciplinary matter arises from formal charges filed by the Office of Disciplinary Counsel (“ODC”) against respondent, John H. Clegg, an attorney licensed to practice law in Louisiana. For the reasons that follow, we suspend respondent from the practice of law for a period of one year and one day, with all but six months deferred, followed by a two-year period of probation.
UNDERLYING FACTS
The facts of this matter are largely undisputed. Respondent was a partner in the New Orleans law firm of McGlinchey Stafford (hereinafter referred to as “McGlinchey” or “the firm”). During the summer of 2006, the managing partners of the firm began to receive reports about respondent that caused them concern. These included accounts that respondent’s office hours and billings were erratic, his appearance was disheveled, and he had been seen in areas of the city where it was known drugs could be acquired. In an effort to help respondent, the partners consulted with Bill Leary, the Executive Director of the Lawyers Assistance Program (“LAP”), and together with Mr. Leary performed an intervention. During the intervention, respondent admitted he was using crack cocaine.[1] With the support of |2the partners, Mr. Leary made arrangements for respondent to be admitted to a ninety-day inpatient treatment program at Pine Grove in Hattiesburg, Mississippi.
*1144 After successfully completing the Pine Grove program, respondent returned to work at the firm in October 2006. At that time, the partners explained to respondent that, as conditions of his return, he would be required to execute a recovery agreement with LAP and abide by all of its provisions, including random drug testing, and he would be required to waive any claim to confidentiality so that LAP could provide the firm with reports on his progress, particularly the random drug screening results. Respondent was initially reluctant to agree to these conditions, but ultimately, on December 18, 2006, he executed a five-year LAP contract, which included the following provisions:
14. I hereby agree that my AA sponsor, my monitor, or any lawyer who is a member of the Committee on Alcohol and Drug Abuse, will notify the LAP Director if they or any of them become aware that any of the conditions of this agreement have been violated. The LAP Director will advise the McGLINCHEY, STAFFORD law firm of the facts regarding said violation. [Emphasis added.]
15. I voluntarily waive all privileges and confidentiality granted by the Louisiana Supreme Court under Rule XIX and La. R.S. 37:221 concerning information received by any member of the Committee on Alcohol and Drug Abuse, LAP, Inc., its staff or employees, relating to my activities in the practice of law, or other matters relating to the consumption of alcoholic beverages, use of other drugs, or in any other way violative of these conditions of probation. [Emphasis added.]
13At the time the LAP agreement was executed, neither respondent nor anyone with the firm reported respondent’s drug use to the ODC.[2]
For several months, respondent was successful in his efforts to comply with his LAP contract. However, in March 2007, Mr. Leary telephoned the firm’s partners to advise that respondent had tested positive for cocaine on a drug screen administered through LAP. Despite their earlier warning of a “zero tolerance policy” regarding his drug use, the partners decided to give respondent another chance. Approximately forty-five days later, in late April 2007, Mr. Leary contacted the firm again to advise that another of respondent’s drug screens was positive for cocaine. The partners confronted respondent and asked him to resign from the firm in accordance with their previous agreement. Respondent refused to do so. The partners then held a firm meeting and voted to expel respondent from the firm as of May 4, 2007. On May 9, 2007, the firm, through its outside ethics counsel, filed a complaint against respondent with the ODC.
DISCIPLINARY PROCEEDINGS
In January 2008, the ODC filed one count of formal charges against respon *1145 dent, alleging that, by using and possessing cocaine, he has violated Rules 8.4(a) (violation of the Rules of Professional Conduct) and 8.4(b) (commission of a | criminal act, especially one that reflects adversely on the lawyer’s honesty, trustworthiness, or fitness as a lawyer in other respects) of the Rules of Professional Conduct. Respondent answered the formal charges and admitted he was employed by the firm in 2006, but he otherwise denied all allegations.
Respondent subsequently filed with the hearing committee chair a motion to seal the record of this disciplinary matter and a motion seeking a protective order, asserting that the evidence of his alleged misconduct is privileged and confidential because it stems from a source (his former law partners) bound by confidentiality pursuant to La. R.S. 37:221. The ODC objected, arguing the privilege is applicable only to LAP and the Committee on Alcohol and Drug Abuse of the Louisiana State Bar Association, of which respondent’s former law partners are not members, employees, or agents.
By order dated May 23, 2008, the hearing committee chair denied the motion to seal and the motion for a protective order. The chair reasoned that the confidentiality provisions contained in La. R.S. 37:221(B) apply to LAP and to the Committee on Alcohol and Drug Abuse, but they do not extend to third parties such as the individual partners of respondent’s former law firm. The chair also noted that the LAP contract executed by respondent contains a provision expressly waiving confidentiality.[3]
The formal charge matter was initially set for a hearing on the merits in February 2009. The ODC declared its intention to call respondent’s former law partners as witnesses at the hearing to testify in support of the allegations of the formal charges. Respondent objected to any such testimony, reiterating his argument |Bthat these witnesses are bound by confidentiality under La. R.S. 37:221 and Supreme Court Rule XIX, § 16(J). After consideration, the committee again rejected respondent’s argument, reasoning “there is no confidentiality” as to the law firm under either provision. Nevertheless, the committee agreed to stay the formal charge hearing pending respondent’s filing of a writ application with this court. On April 17, 2009, this court denied respondent’s writ application with the following order:
Denied. Premature. The parties may raise these issues by objection after the filing of the disciplinary board’s recommendation. See Supreme Court Rule XIX, Section 11(G).
In re: Clegg, 09-0500 (La.4/17/09), 6 So.3d 796.

Formal Hearing

Following the April 17, 2009 action of this court, this matter was reset for hearing before the hearing committee on August 7, 2009.[4] We will briefly summarize the testimony of the witnesses at the hearing.
Bill Leary
Mr. Leary has been the Executive Director of LAP since it was formed in 1992. He was also one of the original members *1146 of the Committee on Alcohol and Drug Abuse. Mr. Leary testified both in person before the hearing committee and by deposition, in each instance generally explaining the history of the LAP program and testifying about the confidentiality issues raised in this matter. Mr. Leary did not give any testimony specific to respondent’s participation in the LAP program.
|fiMr. Leary explained that LAP uses a standardized recovery agreement which he drafted himself, patterned after similar agreements in use in other states.[5] A LAP contract has a five-year term, and is usually signed after the lawyer completes substance abuse treatment. Mr. Leary testified that this is done in the event the treatment facility makes any recommendations for the lawyer upon discharge; for example, if the facility recommends aftercare or family counseling, that will be incorporated into the LAP contract. Under the terms of a LAP agreement, the lawyer must meet with a monitor, attend AA meetings, and is subject to random drug testing 12-14 times per year. Some lawyers enter into LAP contracts voluntarily, but other lawyers are referred to the LAP program by their law firms, and still others are referred in connection with bar discipline or bar admission proceedings.
Mr. Leary testified that confidentiality is very important to individuals who call him asking for help. Mr. Leary assures these individuals that neither he nor any member of the Committee on Alcohol and Drug Abuse can be compelled to reveal information which is provided through LAP. He was adamant that LAP “does not break confidentiality.”
Mr. Leary explained that the purpose of Paragraph 15 of the LAP agreement is to enable him to talk to any number of sources about a lawyer’s recovery. In each specific case, instead of getting a release from all of the people he wants to talk to (like the aftercare group or “people on the telephone who might call” Mr. Leary about a lawyer in recovery), Mr. Leary puts Paragraph 15 in the LAP agreement “so that every time I want to talk to someone, I do not have to go back and get a release done.” Mr. Leary testified that all LAP contracts contain Paragraph 15.
|7Mr. Leary testified that he had “many, many conversations” with respondent about confidentiality, occurring over “a number of months.” Specifically, respondent did not want to sign the LAP contract because of Paragraph 15. Mr. Leary told respondent he would not change the language of the contract, but did assure him that he was not signing a waiver “as to the world” but only as to those persons necessary for Mr. Leary to consult in connection with the recovery process.
Mr. Leary testified that there are certain persons who are part of the LAP program structure whom he considers to be bound by the confidentiality applicable to LAP. These persons include doctors, counselors, monitors, and sponsors, for example — individuals with whom information must be shared so that they can assist Mr. Leary in the performance of his work. However, Mr. Leary testified that he has never considered “outsiders” to be included in this group, such as spouses, children, law firm partners or associates, secretaries, or others. He testified that in his view, these persons are not “agents” of LAP and are not bound by the confidentiality provisions applicable to LAP.
*1147 Donna Klein
Ms. Klein was until 2009 the managing partner of McGlinchey’s New Orleans office. Ms. Klein testified that she became concerned when she received reports that following the firm’s return to New Orleans after Hurricane Katrina, respondent was not coming into the office regularly and was not submitting his billing in a timely fashion. In the summer of 2006, the firm hosted a golf tournament, during which respondent behaved erratically and aggressively and “told an off-colored joke that | shad concerned a number of people, both male and female.” Several of respondent’s friends also expressed concern that he was having problems with “substances.” [6]
Based upon this information, Ms. Klein contacted Mr. Leary, who agreed to help the partners of the firm corufront respondent and offer him the opportunity to go into a treatment facility at the firm’s expense. On the day of the intervention, Ms. Klein was present with respondent and Mr. Leary, as well as the firm’s managing partner, Rudy Aguilar, and respondent’s section head, Henri Wolbrette. During this meeting, respondent admitted he had been abusing crack cocaine and other drugs. The partners told respondent they wanted to help, and arrangements had been made for him to be admitted to Pine Grove. The partners also told respondent that he would have to comply with the treatment recommendations of the doctors at Pine Grove, sign a LAP contract, and stay sober, or else he would lose his job at McGlinchey. Respondent ultimately agreed to get help and went to Pine Grove. After he came home in October 2006, he executed a confidentiality waiver so that the partners could communicate with Mr. Leary about his participation in LAP.
Ms. Klein testified that in March 2007, Mr. Leary contacted her by telephone and reported that one of respondent’s drug screens was positive for cocaine. Ms. Klein testified that she and Mr. Aguilar confronted respondent, as follows:
Q. Did Mr. Clegg admit that he had used cocaine?
A. Yes.
Q. Had relapsed?
A. Yes.... We — He talked about, you know, he said he had just been upset, that it wasn’t going to happen again....
RThe partners accepted respondent’s explanation and decided to give him another chance, notwithstanding their earlier warning to him that drug use would not be tolerated. Nevertheless, Ms. Klein testified that the partners did “tighten up the oversight of him for client protection.” Unfortunately, in April, Mr. Leary called Ms. Klein again and told her that respondent had another positive drug screen. Ms. Klein testified that she called respondent into her office and asked him what happened:
A. He said that relapse is part of the disease. And that he’d had a relapse.
Q. Did he indicate to you — he acknowledged he had used cocaine?
A. He had used.[7]
*1148 At this point, believing the firm “couldn’t take a risk on him working on client matters,” Ms. Klein asked respondent to resign. However, he refused to do so. The equity members of the firm then scheduled a meeting and voted to expel respondent from the firm on Friday, May 4, 2007. Because of concerns that respondent was impaired in the representation of clients,[8] the partners also decided to consult with outside counsel for advice regarding the firm’s obligation to report the matter to the ODC. Ms. Klein contacted New Orleans attorney Rick Stanley, who recommended that a report be made.
On July 6, 2007, respondent executed a release, severance, and non-disparagement agreement with McGlinchey. The firm asked respondent to sign this document to “insure compliance with our requirements and the L.A.P. agreement. And in the event we had to report something, or had to advise somebody, of either an | ipillegality or something like that, that we would have the ability to do that.” The release, severance, and non-disparagement agreement contains a paragraph which specifically pertains to the firm’s release of information to the ODC.
In response to the questions of the hearing committee members, Ms. Klein testified that she had a number of conversations with respondent about the firm’s request for a waiver of confidentiality. Specifically, she wanted to make sure that the partners had access to information about respondent’s progress in recovery and his compliance with the LAP agreement, and in her opinion, “Jack understood that.” She further testified that she never told respondent the firm would not release the information it obtained, and she “wouldn’t have said that because it’s not true.” Nevertheless, Ms. Klein testified that the firm did make every effort to protect respondent’s confidentiality, to the extent that was possible. For example, during the period when respondent was in treatment at the Pine Grove facility, clients of the firm were not told the reason for his absence from the office, and within the firm, “only people in a need to know position” were told about respondent’s issues.
With respect to reporting respondent to the ODC, Ms. Klein was asked why the firm did not feel the need to make its report at the time of the intervention, or even at the time of the first failed drug test. Ms. Klein responded:
Because he was in a protected environment, getting treatment for the problem that prompted the intervention, and he was representing clients. And he wasn’t out there either harming himself or harming others.... And as far as I was concerned, as long as he would agree to helping himself, and us helping him, [then] he was not a danger to anybody.
On cross-examination, Ms. Klein clarified that she tried to protect respondent’s confidentiality as to clients and others within the firm because she “thought it was the right thing to do,” not because she “thought some statute applied.” She explained that |nit was not her intent to “embarrass” respondent or “tell anybody about what had happened” unless they needed to know.
Rudy Aguilar
*1149 Mr. Aguilar testified that everything went fine for a while, until respondent tested positive for cocaine in March 2007. Mr. Aguilar went to the New Orleans office at that time and met with respondent and Ms. Klein. Mr. Aguilar’s testimony regarding the meeting was as follows:
A. Jack said he was under a lot of stress from lots of different things and that his, I believe, his daughter was getting married. And all kind of — I don’t remember all of the details. But we said, “Jack, we 112shouldn’t do this, but we are going to, instead of terminating you immediately, as we said we would do, as we should do, we’re going to give you one more chance.”
*1148 Mr. Aguilar is the managing partner of McGlinchey. He oversees all of the firm’s offices across the country, but practices in the Baton Rouge office. Mr. Aguilar’s *1149 testimony was initially similar to that of Ms. Klein, touching on respondent’s performance at the firm golf tournament, the intervention with Mr. Leary, and respondent’s admission to and successful completion of the Pine Grove treatment program. Thereafter, the firm asked respondent to execute a LAP agreement as a condition of his continued employment. According to Mr. Aguilar, he and respondent discussed the confidentiality provision in the LAP contract on several occasions. Specifically, respondent was concerned that information could get “outside of the law firm, with what he thought was over broad language of the L.A.P. contract.” Therefore, respondent wanted to revise the confidentiality provision “to say that Bill Leary’s group could not tell anybody else, and thus, [McGlinchey] would not be able to tell anybody else either.” After discussing the matter with Mr. Leary and another partner in the firm who had successfully participated in LAP, Mr. Aguilar told respondent the firm would not agree to make any changes in the LAP contract.
[[Image here]]
Q. During that conversation, did Mr. Clegg acknowledge he had used cocaine?
A. Yes. He did. He acknowledged it and he said that it was — Well, I do remember him also saying, you know, “There’s the possibility of a false positive. And lots of things can^ — I’m not going to fight that with you.” I think were his actual words but it was, you know, to me it was “Yes, I failed the test. And it proved positive.”
In response to the questions of the hearing committee members, Mr. Aguilar reiterated that respondent never admitted during this conversation that he used drugs:
He did not say, “I admit I used cocaine or drugs.” The first time, my recollection is that he said, “There can be false positives.” ... And he said, “But I’m not going to fight that with you because it’s a losing battle,” or something like that.
He also said, “I’m under a lot of stress from all these other things, my daughter is getting married.” He was having a problem with one of our partners. They were having disagreements or, you know, they were friends and no longer friends. I didn’t get into too much of the detail with him at that time.
And he said, you know, “I’m under a lot of stress and, you know, give me another chance.” So I mean, did he actually say the words? No. But was my impression of the conversation that he knew that he had taken it? Yes.
Returning to his testimony on direct, Mr. Aguilar testified that approximately forty-five days later, respondent had another positive drug screen. Asked whether respondent admitted using cocaine on *1150 this occasion, Mr. Aguilar testified that respondent “didn’t deny it. But I don’t remember him saying, he did.” Mr. Aguilar told respondent to immediately stop doing work for clients, but respondent refused, | issaying he had to be in New York for a deposition. At this point, Mr. Aguilar informed respondent that if he did not stop his plans, he would call a partners’ meeting and recommend respondent’s expulsion from the firm. Respondent did not comply with Mr. Aguilar’s request, and so he was expelled from the firm.
Mr. Aguilar testified that after the second drug screen, the firm considered whether it had an obligation to report to the ODC that “we have what we believe to be an impaired lawyer, going to go take depositions.” The partners contacted Rick Stanley for advice in that regard and ultimately filed a complaint with the ODC suggesting respondent posed a threat of harm to the public. Mr. Aguilar testified he did not believe the firm had an ethical obligation to report respondent at any time previously, because “we had him very well supervised so that we make sure that he did not cause a problem for us or the clients.” Mr. Aguilar also testified that the firm has had other impaired lawyers go through the LAP program successfully, and the firm has not reported those lawyers to the ODC.
Rick Stanley
Mr. Stanley testified by deposition. The partners of the firm consulted Mr. Stanley for advice regarding their ethical obligations pertaining to respondent. Mr. Stanley advised that when a lawyer is using illegal substances and may have an addiction, and is not in compliance with the LAP program, that presents potential harm to the clients of the firm and the firm itself; accordingly, the firm has an obligation to report to the ODC under Rule 8.3, and an obligation to mitigate any improper conduct by the lawyer. Based upon Mr. Stanley’s advice, the firm reported respondent’s misconduct to the ODC on May 9, 2007.
| uRespondent
Respondent testified on cross-examination. Respondent was asked whether he had acknowledged his use of cocaine to a member of the firm, but in response, he testified, “I have to take the 5th Amendment on that, as well as the privilege afforded me by the statute. So even if it were true, which it’s not, I take the privilege.” He denied that his office hours and attendance were erratic in 2006, explaining that he was working mostly in the late afternoons on “a case involving communications with China.” Respondent also denied that his appearance was disheveled and slovenly, or that he had been seen frequenting parts of New Orleans known to be drug havens. Respondent took the Fifth Amendment in response to questions whether he has ever used cocaine, heroin, or Ecstasy. He asserted “any privilege afforded to [him] by Law of the State of Louisiana” in response to a question whether he has ever tested positive on random drug screening through LAP.
Respondent characterized the confidentiality provision of the LAP agreement, set forth in Paragraph 15, as “nonsensical.” He explained that he was very familiar with the public policy set forth in La. R.S. 37:221, and after reading Paragraph 15 several times, he thought it made no sense “that it was public policy in Louisiana to grant that privilege. And to have a person participate in L.A.P., having to give that back, simply made no sense.” Respondent discussed his concerns with Mr. Leary numerous times, and according to respondent, Mr. Leary said he needed a release. Respondent told Mr. Leary a release was fine, but Paragraph 15 “is way too broad. It could be misread and misconstrued by *1151 others to mean a waiver as to the world.” Respondent testified that Mr. Leary assured him that was not what the paragraph meant. Moreover, respondent testified he was concerned about the language in Paragraph 15 referring to conditions of probation, because he “wasn’t on anyone’s | ,r,probation.” Respondent asked Mr. Leary about this language, and according to respondent, Mr. Leary explained the wording “got in there from people that are referred to us that are on probation.”[9] When respondent protested that did not apply to him, Mr. Leary nevertheless refused to change the language of the contract.[10] Respondent also discussed his concerns with Mr. Aguilar, but Mr. Aguilar told respondent the LAP contract could not be changed and that if he did not sign the contract, he would lose his job at McGlinchey. Because he “wasn’t prepared to lose [his] job at that point,” respondent signed the contract.
Respondent admitted he was terminated from McGlinchey, but “ask[ed] to invoke the privilege” as to the reason why. Respondent testified he currently has a solo practice in New Orleans. He refused to answer any questions about whether he is under a LAP contract or is currently monitored for drug use in any way, including random drug screening. Invited by the hearing committee chair to answer these same questions in the context of providing evidence in mitigation, respondent stated, “I have to stand on the privilege.”

Hearing Committee Report

Following the hearing, the hearing committee filed its report with the disciplinary board. In a split recommendation, the chair and the public member of the committee rejected respondent’s arguments regarding confidentiality and privilege |1fiand recommended he be suspended from the practice of law for one year and one day and be required to enroll in LAP. The lawyer member of the committee dissented, agreeing with respondent that the formal charges could not be proven by clear and convincing evidence because his statements regarding his cocaine use were confidential.
The hearing committee initially determined that respondent was contesting the validity of the waiver set forth in Paragraph 15 of the LAP contract.[11] Specifically, he alleges a vice of consent which has two components: duress (because if he did not sign the contract he would lose his job) and error (because he was assured the language meant something different from what he thought it meant). The committee found no merit to these arguments. As to duress, the committee found there was no evidence to indicate respondent was anything but an at-will employee, and as such he could be given a choice to either sign the LAP contract or lose his job *1152 without implicating a vice of consent. As to error, the committee found respondent discussed Paragraph 15 with Mr. Leary as well as with McGlinchey personnel, and he repeatedly sought to change the language from a waiver of confidentiality to a release of information to his employer. Accordingly, the committee concluded that respondent clearly understood the language, as written, was intended to constitute a waiver of confidentiality; it was for that precise reason he sought to change it.
The committee next rejected respondent’s argument that such a waiver of confidentiality is against the public policy set forth in La. R.S. 37:221. First, the statute’s requirement of confidentiality does not apply to Ms. Klein or Mr. Aguilar, as neither is a member, employee, or agent of LAP or of the Committee on Alcohol and Drug Abuse. Secondly, the committee concluded that a waiver of confidentiality |17is permissible and that the existence of a waiver does not defeat the publie policy of encouraging lawyers to seek help for drug or alcohol problems.
Based on these findings, the committee concluded the ODC carried its burden of proof solely on the basis of the testimony of Ms. Klein and Mr. Aguilar that respondent admitted using drugs in the initial intervention, and Ms. Klein’s testimony that respondent admitted his drug use again to her after failing his drug tests. The committee reasoned that these declarations against interest were properly considered from an evidentiary standpoint and support the conclusion that respondent violated Rule 8.4(b) of the Rules of Professional Conduct.
As a sanction for his misconduct, the committee recommended respondent be suspended from the practice of law for one year and one day, and “be required to enroll in LAP and to comply with all the terms of a LAP Recovery Agreement for a period of five years including attending monitoring sessions and being subject to random drug testing.” The committee observed that this sanction will allow respondent, “a very intelligent lawyer who has had a very successful practice,” to address his substance abuse problem while simultaneously protecting the public.
The lawyer member of the committee dissented, reasoning that there is a “veil of confidentiality” over all matters related to the LAP program and that any waiver of this confidentiality is violative of public policy. Because confidential information is the only evidence to support the formal charges in this case, the lawyer member concluded the formal charges cannot be proved.
Respondent filed an objection to the hearing committee’s report, taking issue with nearly all of the committee’s findings as well as its recommended sanction. The ODC took the position that the appropriate discipline in this case is a fully deferred 11sone year and one day suspension, subject to a period of probation coinciding with a five-year LAP contract.

Disciplinary Board Recommendation

At the outset, the disciplinary board addressed several procedural issues. First, the board determined that respondent’s law firm is not an agent of LAP. The evidence at the hearing established that, while the firm was acting in concert with LAP, Mr. Leary did not consider the firm to be acting as an agent of LAP. Moreover, the firm did not view its role as an agent of LAP.
Second, the board found the waiver signed by respondent was valid. The board noted that a waiver is not contrary to public policy, as both La. R.S. 37:221 and Supreme Court Rule XIX, § 16(J) allow a lawyer participating in LAP to waive the confidentiality of his participation and per *1153 mit the release of information relating to his participation. Further, there is insufficient evidence that respondent was coerced into signing the waiver in order to maintain his position with the firm, although undoubtedly that factor played an important role in his decision to sign the waiver. Respondent also argues that he viewed the waiver as limited in nature, ie., he believed the information the firm received from LAP could only be used for its internal oversight of his compliance with the LAP recovery agreement. However, the board noted that respondent’s agreement with the firm did not contain any limitation on how the firm could use the information it received from LAP. Therefore, the board concluded that the waiver signed by respondent provided a valid basis for LAP to release information to the law firm and that the firm’s subsequent release of the information to ODC was not precluded by any agreement respondent had with the law firm.
|1flFinally, the board determined that the testimony of respondent’s law partners was properly admitted at the formal charge hearing. The board agreed with respondent that, under La. R.S. 37:221, persons participating in LAP-sponsored interventions are included in the privilege. Nevertheless, the board found this privilege applies only to civil and criminal matters, not lawyer disciplinary matters, which are sui generis. The rules applicable to lawyer disciplinary enforcement contain a specific provision governing the confidentiality of communications to the Committee on Alcohol and Drug Abuse, which includes LAP. This rule, Supreme Court Rule XIX, § 16(J), has a narrower scope, which the board determined “is more attune to the purposes of lawyer disciplinary proceedings.” Therefore, the board found that the testimony of respondent’s former law partners was properly admitted and considered by the hearing committee.
The board then concluded that, based upon this testimony, respondent violated Rule 8.4(b) of the Rules of Professional Conduct as charged. Respondent’s violation was established by (1) his admission to his law partners at the intervention that he was using cocaine, and (2) his admission to Ms. Klein that he was using cocaine after she confronted him with the two positive drug tests.
The board determined respondent knowingly and intentionally violated a duty owed to the public. The baseline sanction for respondent’s misconduct is suspension. In mitigation, the board found respondent has no prior disciplinary record. In aggravation, the board found a pattern of misconduct and substantial experience in the practice of law (admitted 1983).
Turning to the issue of an appropriate sanction, the board rejected the ODC’s recommendation of a fully deferred suspension as unduly lenient, given the absence of any evidence suggesting respondent has been successful in addressing his hosubstance abuse issues. Even though this matter involves the unusual situation of misconduct relating to the use of illegal drugs without harm to clients or the legal system, the board noted that the prior jurisprudence nevertheless indicates that a lengthy suspension is warranted.
Based on this reasoning, the board recommended respondent be suspended from the practice of law for one year and one day. The board further recommended that respondent be required to execute and comply with a five-year LAP recovery agreement.
Respondent filed an objection to the disciplinary board’s recommendation. Accordingly, the case was docketed for oral *1154 argument pursuant to Supreme Court Rule XIX, § 11(G)(1)(b).
DISCUSSION
I.
This case presents itself to the court in a rather unusual posture as respondent has raised no substantive defenses on the merits of the formal charges. Rather, respondent’s arguments, in their entirety, are based on the applicability of the privileges set forth in Supreme Court Rule XIX, § 16(J) and La. R.S. 37:221(B). Therefore, we must first determine the scope of these privileges.
Although this issue is res nova in our jurisprudence, our inquiry is guided by well-established principles of statutory interpretation. The starting point in the interpretation of any statute is the language of the statute itself. When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature. Kinchen v. Livingston Parish Council, 07-0478 (Lajl0/16/07),21 967 So.2d 1137 (quoting State v. Dick, 06-2223 (La.1/26/07), 951 So.2d 124). The meaning and intent of a law is determined by considering the law in its entirety and all other laws on the same subject matter and by placing a construction on the law that is consistent with the express terms of the law and with the obvious intent of the legislature in enacting the law. SWAT 24 Shreveport Bossier, Inc. v. Bond, 00-1695, p. 11 (La.6/29/01), 808 So.2d 294, 302; Succession of Boyter, 99-0761, p. 9 (La.1/7/00), 756 So.2d 1122, 1129.
With these principles in mind, we now turn to an examination of the privilege set forth in La. R.S. 37:221(B). That statute provides, in pertinent part:
B. Privilege and confidentiality. (1) Any information, report, or record, whether written or oral, that the Committee on Alcohol and Drug Abuse of the Louisiana State Bar Association, Lawyer’s Assistance Program, Inc., or any member, or employee, or agent of either generates, receives, gathers, or maintains is confidential and privileged. No member of the Committee on Alcohol and Drug Abuse, or agent, or employee of Lawyer’s Assistance Program, Inc., may disclose that information, report or record without written approval of the subject judge, lawyer, law student, or prospective lawyer. No person shall be required to disclose, by way of testimony or otherwise, privileged information or to produce, under subpoena, any records, documentary evidence, opinions, or decisions relating to such privileged information:
(a) In connection with any civil or criminal case or proceeding.
(b) By way of any discovery procedure.
The first sentence of this statute classifies any information received, gathered, or maintained by LAP or its employees and agents[12] as confidential and privileged. The statute then provides that no “agent, or employee of Lawyer’s Assistance Program, Inc., may disclose that information, report or record without written | ^approval” of the subject lawyer. It further provides “[n]o person shall be required to disclose, by way of testimony or otherwise, privileged information....” [Emphasis added.]
*1155 This statutory scheme sets up two broad classifications: (1) agents and employees of LAP who may only disclose privileged information upon written approval of the subject lawyer, and (2) other persons who are not required to disclose privileged information. There is some degree of overlap between these categories, as the term “person” as used in the second category may be broad enough to encompass agents and employees of LAP, meaning that LAP agents and employees are not required to disclose privileged information and further may only disclose it with written approval of the subject lawyer. However, the converse is not true: persons who are not LAP employees or agents are not required to disclose privileged information, but are also not mandated to obtain written approval of the subject lawyer in order to disclose privileged information. With regard to these non-LAP persons, the clear intent of the statute is to make the privilege run in their favor — i.e., they are not required to reveal privileged information, but should they voluntarily wish to do so, they are not compelled to seek the written approval of the subject lawyer. Stated in other words, the subject lawyer retains an absolute veto power over disclosure of privileged information by LAP agents and employees but has no such power over persons who are not considered LAP agents or employees. In the latter case, the non-LAP person, not the subject lawyer, has sole control over whether the privileged information is revealed.
This interpretation is in accord with Supreme Court Rule XIX, § 16(J), which provides:
J. Confidentiality of Communications to the Louisiana State Bar Association Committee on Alcohol and Drug IgjAbuse. No member of the Committee on Alcohol and Drug Abuse of the Louisiana State Bar Association shall be required or permitted to disclose any communication made to that member or any information received by that member while acting in the course of committee business concerning the conduct, behavior, or condition of a lawyer without the express consent of that lawyer.
Like La. R.S. 37:221(B), Supreme Court Rule XIX, § 16(J) places a limitation on members of the Committee on Alcohol and Drug Abuse of the Louisiana State Bar Association who may only disclose privileged information with the express consent of the subject lawyer. The language of this rule is clear and unambiguous in its language and scope, which is limited to members of the Committee on Alcohol and Drug Abuse of the Louisiana State Bar Association.[13] Outside of these persons who are members of the Committee on Alcohol and Drug Abuse, Supreme Court Rule XIX, § 16(J) does not place any general limitation on the disclosure of privileged information.
Our interpretation is also bolstered by reference to Rule 8.3, the rule that requires the reporting of professional misconduct. Rule 8.3(a) imposes a reporting requirement on a lawyer who learns of a violation of the Rules of Professional Conduct by another lawyer. However, Rule 8.3(c) creates an exception to this general rule, providing, “[t]his rule does not require the disclosure of information ... gained by a lawyer or judge while participating in an approved lawyers assistance program....” [Emphasis added.] As in *1156 La. R.S. 37:221(B), Rule 8.3(c) does not require the disclosure of privileged information, but does not preclude voluntary disclosure of such information, nor does it mandate consent from the subject lawyer to reveal the information.
|⅞4⅛ summary, we find La. R.S. 37:221(B) and Supreme Court Rule XIX, § 16(J) set forth clear and unambiguous limitations on the disclosure of privileged information. In the case of agents or employees of LAP (and the Committee on Alcohol and Drug Abuse), express consent of the subject lawyer is required for disclosure. As to persons who are not agents or employees of LAP (or the Committee on Alcohol and Drug Abuse), no such consent is required. These latter persons are not required to reveal privileged information, but nor are they required to obtain consent of the subject lawyer should they wish to reveal privileged information.
A review of the recovery agreement signed by respondent reveals that, through Paragraphs 14 and 15 of the agreement, he gave his express written consent to allow Mr. Leary, in his capacity as LAP Director, to disclose any violations of the agreement to the McGlinchey firm.[14] Therefore, we find that Mr. Leary’s disclosure of privileged information to respondent’s law partners was in compliance with the requirements of La. R.S. 37:221, as he did so with respondent’s written consent.[15]
Having found Mr. Leary was authorized to disclose privileged information to respondent’s law partners, the next question presented is whether these persons may be considered employees or agents of LAP or members of the Committee on Alcohol or Drug Abuse, such that they would be precluded from testifying regarding this ^information without respondent’s express consent. Both Ms. Klein and Mr. Aguilar testified that they are not employees or agents of LAP or members of the Committee on Alcohol and Drug Abuse. Likewise, Mr. Leary, the Director of LAP, testified that he has never considered “outsiders,” such as law firm partners or associates, to be “agents” of LAP. He further testified that in his view, these persons are not bound by the confidentiality provisions applicable to LAP.
We agree. By all indications, both La. R.S. 37:221(B) and Supreme Court Rule XIX, § 16(J) contemplate a very narrow group of persons who are actually employed by LAP or serve as authorized agents of that program. While persons outside of LAP may play a significant role in the recovery process, there is no statutory justification for including these persons as agents of LAP. Therefore, we conclude respondent’s law partners are not required to reveal privileged information but are also not required to obtain respon *1157 dent’s express consent should they wish to voluntarily do so.
II.
Having determined the testimony at issue is not privileged, we now examine the record to determine if there is sufficient evidence to support the ODC’s allegations that respondent possessed and used controlled substances. In this regard, we focus on the testimony of two of respondent’s law partners, Donna Klein and Rudy Aguilar.
The testimony of Ms. Klein and Mr. Aguilar establishes that respondent admitted to using crack cocaine and other drugs in 2006. After undergoing treatment, respondent tested positive for drugs on two occasions in March and April 2007. After learning of the latter positive drug test, respondent’s law partners became 12ficoncerned he presented a threat of harm to the firm’s clients and asked him to refrain from practicing. When respondent refused to do so, he was terminated.
We recognize this testimony, particularly with regard to respondent’s admission of drug use, may be considered hearsay. However, we have observed “the purpose of rules of evidence primarily intended to govern jury trials, particularly the hearsay rules, are less compelling in the context of imposing discipline on members of the legal profession.” In re: Quaid, 94-1316, p. 8, n. 2 (La.11/30/94), 646 So.2d 343, 348. As the trier of fact in disciplinary proceedings, we retain the power to determine the admissibility of evidence pursuant to our original jurisdiction. Id.
We conclude the testimony of Ms. Klein and Mr. Aguilar, which was found to be credible by the hearing committee, has sufficient reliability to be admitted into evidence. Based on this testimony, we conclude the ODC has established by clear and convincing evidence that respondent has possessed and used controlled substances and has thereby violated Rules 8.4(a) and 8.4(b).
III.
Having found evidence of professional misconduct, we now turn to the question of the appropriate sanction in this matter. In determining a sanction, we are mindful that disciplinary proceedings are designed to maintain high standards of conduct, protect the public, preserve the integrity of the profession, and deter future misconduct. Louisiana State Bar Ass’n v. Reis, 513 So.2d 1173 (La.1987). The discipline to be imposed depends upon the facts of each case and the seriousness of the offenses involved considered in light of any aggravating and mitigating circumstances. Louisiana State Bar Ass’n v. Whittington, 459 So.2d 520 (La.1984).
127A review of our jurisprudence indicates that in cases where a lawyer has violated Rule 8.4 through the use of illegal drugs, we have typically imposed periods of suspension, which have sometimes been deferred all or in part. See In re: Bertucci, 08-1349 (La.9/26/08), 990 So.2d 1275 (fully deferred two-year suspension, subject to a two-year period of probation with conditions, imposed upon a lawyer who participated in a pre-trial diversion program after he was detained by the police and found to be in possession of illegal drugs; the lawyer successfully completed a drug treatment program and enrolled in LAP); In re: Hazard, 05-1975 (La.12/12/05), 916 So.2d 117 (three-year suspension imposed upon a lawyer who pleaded nolo contendere to charges of simple possession of marijuana, oxycodone, and dihydrocodeine); In re: Steinhardt, 04-0011 (La.9/9/04), 883 So.2d 404 (three-year suspension, with two years deferred, followed by a two-year period of probation, *1158 imposed upon a lawyer who was convicted of misdemeanor possession of marijuana, where the court found the lawyer had “acknowledged her substance abuse problems and has taken positive steps to address these problems ... ”).
The facts of the instant case represent a departure from the earlier cases in that respondent has not been charged with or convicted of any criminal offense. In this regard, the prior jurisprudence offers little specific guidance as to the length of the suspension to be imposed.[16] Nonetheless, in general terms, the case law suggests the baseline sanction for Rule 8.4 violations involving the use of illegal drugs is a suspension ranging from one to three years.
_[2⅞Another factor bearing on discipline is the well-recognized proposition that chemical dependency may cause a lawyer to commit acts of professional misconduct that would not have occurred but for his impairment. Louisiana State Bar Ass'n v. Longenecker, 538 So.2d 156, 163 (La.1988) (on rehearing). When there is an obvious causal connection between the substance abuse and the misconduct, our decisions have often deferred part of the suspension and included a component of probation designed to ensure the lawyer makes meaningful efforts to address his or substance abuse problems through partie-ipation in LAP.[17] See, e.g., Steinhardt, 04-0011 at p. 11, 883 So.2d at 410 (holding “it is appropriate to defer two years of the suspension, subject to a two-year period of supervised probation during which respondent shall fully and completely adhere to all terms of her LAP recovery agreement and with such other conditions as may be imposed upon her by the LAP.”).
Based on the evidence in the instant record, it is impossible to ignore the interrelation of respondent’s substance abuse problems and the Rule 8.4 violation. Under these circumstances, we believe the approach of Steinhardt — ie., a partially-deferred suspension combined with conditional probation — is instructive.
Considering all the factors, we conclude a suspension from the practice of law for a period of one year and one day is appropriate. In light of the connection between the misconduct and respondent’s substance abuse, we will defer all but six months of this suspension with the explicit condition that before being reinstated pursuant to Supreme Court Rule XIX, § 23, respondent shall provide the court with written confirmation that he has executed a LAP recovery agreement. Such confirmation shall be in the form of a letter from the Executive Director of LAP |2!)Verifying the date on which the recovery agreement was *1159 executed. Upon reinstatement, respondent shall be placed on unsupervised probation for a period of two years, subject to the condition that he fully comply with all obligations of his LAP recovery agreement. Any failure of respondent to comply with the conditions of probation, or any misconduct during the probationary period, may be grounds for making the deferred portion of the suspension executory, or imposing additional discipline, as appropriate.
DECREE
Upon review of the findings and recommendation of the hearing committee and disciplinary board, and considering the record, briefs, and oral argument, it is ordered that John H. Clegg, Louisiana Bar Roll No. 1034, be and hereby is suspended from the practice of law for a period of one year and one day. All but six months of that suspension shall be deferred with the explicit condition that before being reinstated pursuant to Supreme Court Rule XIX, § 23, in addition to complying with all other requirements set forth in § 23, respondent shall provide the court with a letter from the Executive Director of the Lawyers Assistance Program confirming that he has executed a recovery agreement with the Lawyers Assistance Program. Upon reinstatement, respondent shall be placed on unsupervised probation for a period of two years, subject to the condition that he fully comply with all obligations of his recovery agreement with the Lawyers Assistance Program. Any failure of respondent to comply with the conditions of probation, or any misconduct during the probationary period, may be grounds for making the deferred portion of the suspension executory, or imposing additional discipline, as appropriate. All costs and expenses in the matter are assessed against respondent in accordance with Supreme |snCourt Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court’s judgment until paid.
KNOLL, J., concurs in part and dissents in part, with reasons.

 Retired Judge Philip C. Ciaccio, assigned as Justice ad hoc, sitting for Chief Justice Catherine D. Kimball.

. The formal charges filed by the ODC allege that respondent admitted his cocaine use to his partners prior to the intervention conducted by Mr. Leary; however, the hearing committee made a factual finding that this allegation was not supported by any evidence presented at the hearing.

. Rule 8.3 of the Rules of Professional Conduct provides in pertinent part as follows: (a) A lawyer who knows that another lawyer has committed a violation of the Rules of Professional Conduct that raises a question as to the lawyer’s honesty, trustworthiness or fitness as a lawyer in other respects, shall inform the Office of Disciplinary Counsel.
[[Image here]]
(c) This rule does not require the disclosure of information otherwise protected by Rule 1.6 or information gained by a lawyer or judge while participating in an approved lawyers assistance program or while serving as a member of the Ethics Advisory Service Committee.

. In response to the chair's ruling, respondent filed an "emergency writ application” directed to the disciplinary board. On June 9, 2008, the board denied the application and affirmed the order of the hearing committee chair.

. In order to allow the ODC to make a record of this matter, while at the same time attempting to recognize respondent's assertion of privilege, the hearing committee ordered the record of the hearing sealed. The disciplinary board subsequently vacated the order.

. Mr. Leary acknowledged that he could have a done "a better job” of drafting the LAP contract. Asked how he would change it if he could, Mr. Leary replied, "I have thought about that, and I would have to think some more on how I would draft that for each individual case.”

. This hearsay testimony was not offered for the truth of the matter, but only to show that the firm had a basis to proceed with an intervention. Ms. Klein testified she did not ask respondent about his possible drug abuse pri- or to the intervention.

7. It is not clear from Ms. Klein’s testimony whether respondent actually acknowledged using cocaine after the second positive drug screen. Later in her testimony, Ms. Bilein seemed to indicate that this was an assumption on her part, as she stated, "I assumed he *1148 was using, because he had relapsed.” [Emphasis added.]

. Respondent was scheduled to fly to New York on Monday, May 7th to take depositions for a client.

.Actually, Mr. Leary testified that the ‘'probation” language refers to the fact that the LAP contract is “a probation type contract” that will no longer be in effect if the LAP participant violates any conditions of the contract. Furthermore, he explained that the use of the term “probation” applies when a law firm takes a lawyer back following substance abuse treatment, but only on certain terms and conditions. Mr. Leary acknowledged that this wording “is probably phrased wrong” but suggested it is not "a critical part of the contract.”

. According to respondent, Mr. Leary told him that "no paragraphs were ever changed. That his contract was his contract and it was the same way it was then as it was when he first did it and he refused to change it.” Respondent testified that his impression of Mr. Leary is that he "is a one size fits all guy."

. The committee noted that this paragraph, while “in artfully written,” is standard in all LAP contracts.

. We recognize the statute also refers to the Committee on Alcohol and Drug Abuse of the Louisiana State Bar Association and its members, agents, and employees; however, for purposes of this opinion, our focus is on LAP.

. Presumably, this section also applies to LAP, which was formed by the Committee in 1991 as a non-profit corporation in order “to coordinate and carry out the goals of the Committee.” See the website of the Louisiana State Bar Association, which is available at http://www.lsba.org/2007MemberServices/ laphistory.

. On its face, the language of Paragraph 15 might be considered to constitute a full waiver as to the world, thereby allowing Mr. Leary to reveal privileged information to anyone without limits. However, Mr. Leary has taken a considerably narrower view of the Paragraph 15 waiver, explaining he believes it is limited to his communication with other professionals involved in the recovery process. In any event, we need not decide the scope of the Paragraph 15 waiver, as our inquiry is limited to the information disclosed to respondent’s law partners. It is undisputed Paragraph 14 expressly authorized Mr. Leary to disclose information relating to violations of the recovery agreement to respondent's law partners.

. Respondent argues his consent to the waiver provisions was vitiated as a result of duress and/or error. This argument was discussed and rejected by the hearing committee. Finding no error in the analysis of the hearing committee, we adopt its reasoning and reject respondent’s vice of consent argument.

. The board suggested an analogy could be made to In re: Redmon, 05-2187 (La. 12/12/05), 916 So.2d 118, in which the court imposed a consent discipline of an eighteen-month suspension, followed by two years of supervised probation, on a lawyer who admitted violation of Rule 8.4(b) after he tested positive for cocaine. Like the instant case, the respondent in Redmon does not appear to have been the subject of any prior criminal proceedings. However, because that case was presented to the court in the context of a petition for consent discipline, the facts were not well developed. Moreover, we have held consent disciplinary proceedings have limited precedential value in future cases. In re: Hernandez, 00-1283 (La. 10/6/00), 770 So.2d 330.

. Respondent has suggested any disposition in this case short of dismissal of the formal charges may severely damage the viability of LAP and place a chilling effect on the willingness of lawyers to seek help for substance abuse issues. We disagree. Our goal has been and will continue to include providing the full resources of the bar to these lawyers to help them overcome their problems and return as active and productive members of the profession.